716 F.2d 206
 1983-2 Trade Cases 65,591
 DANNY KRESKY ENTERPRISES CORPORATION, Appellant and Cross-Appellee,
v.
Larry MAGID, Herbert Spivak, Joseph Spivak and Allen Spivak,
individually and trading as Electric Factory
Concerts, Appellees and Cross-Appellants.
 Nos. 83-5074, 83-5075.
 United States Court of Appeals,
Third Circuit.
 Argued July 11, 1983.
Decided Sept. 2, 1983.
 
 Steven M. Kramer (argued), Philadelphia, Pa., for appellant and cross-appellee, Danny Kresky Enterprises Corp.; Robert Whitehill, Pittsburgh, Pa., of counsel.
 Richard P. McElroy (argued), Jeanne P. Wrobleski, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellees and cross-appellants, Larry Magid, Herbert Spivak, Joseph Spivak and Allen Spivak, individually and trading as Elec. Factory Concerts; H. Yale Gutnick, Strassburger, McKenna, Messer, Shilobod & Gutnick, Pittsburgh, Pa., of counsel.
 Before SEITZ, Chief Judge, SLOVITER and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 Before us are cross-appeals by plaintiff, Danny Kresky Enterprises Corporation (Kresky Corp.), and defendants, Larry Magid, Herbert Spivak, Joseph Spivak and Allen Spivak, individually and trading as Electric Factory Concerts, a partnership (Electric Factory), arising out of Kresky Corp.'s suit in which it alleged Electric Factory committed antitrust violations in connection with the promotion of "black oriented" concerts in the Pittsburgh, Pennsylvania market. A jury awarded plaintiff damages of $5,500; the district court vacated the award, directing entry of judgment n.o.v.; and plaintiff appeals. The district court entered a permanent injunction against defendant, and defendant appeals. We will affirm entry of the injunction, reverse the judgment n.o.v., and reinstate the damage award.
 
 II.
 
 2
 Kresky Corp. and Electric Factory are competitors in the concert promotion business. Concert promoters ordinarily submit bids to the booking agent of a musical artist in order to obtain an agreement to promote a concert performance by that artist. Often there are bids by several promoters. The decision to accept or reject the bid is made by the artist or the artist's management. Two or more promoters frequently co-promote concerts, sharing in the profits and losses.
 
 
 3
 Electric Factory is headquartered in Philadelphia, which is acknowledged to be one of the most lucrative markets in the United States for the performance of popular music concerts. The Spectrum Arena is the largest and most attractive facility for this purpose in Philadelphia and provides the most economical site for concert performers with large drawing power. In 1972, Electric Factory was given exclusive access to the Spectrum for the promotion of concerts. The written agreement terminated in 1977, although it was a disputed factual issue whether that exclusive arrangement continued, as plaintiff alleged, pursuant to an oral understanding.
 
 
 4
 Kresky Corp., which is headquartered in Pittsburgh, filed this suit in the United States District Court for the Western District of Pennsylvania alleging that Electric Factory conspired with others to unlawfully restrain trade in the Pittsburgh market in violation of sections 1 and 2 of the Sherman Act through blockbooking of concerts and group boycotts. In essence, the complaint alleged that Electric Factory used its exclusive arrangement with the Spectrum and its exclusive license for the promotion of concerts at the Cincinnati Riverfront Coliseum to force various concert performers to perform for Electric Factory in Pittsburgh, and that it threatened artists, artists' agents, and artists' managers that it would not deal with them in any market unless it obtained the artists' services for the Pittsburgh market. Among the co-conspirators listed were Spectrum, Inc., Irv Nahan, Georgie Woods, Jot Corporation, Borgas, Inc., and WDAS (Max H. Leon, Inc.), a radio station in Philadelphia alleged to be "one of the most powerful, in terms of influence, black oriented radio stations in the country." The complaint alleged "[i]t is critical to black oriented artists that their music be played on WDAS." Electric Factory filed a counterclaim alleging that Kresky Corp. and several co-conspirators violated sections 1 and 2 of the Sherman Act.
 
 
 5
 The case was tried before a jury for nine days from February 29 to March 16, 1981. Among the evidence introduced by plaintiff was the testimony of Danny Kresky, plaintiff's chief operating officer, that he was not permitted by the artists' management to discuss or bid for promotion rights to nine black-oriented concerts at the Civic Arena in Pittsburgh between 1976 and 1979, all nine of which were eventually promoted by Electric Factory. Plaintiff also introduced evidence of, inter alia, Electric Factory's exclusive agreement to promote concerts at the Spectrum, its arrangement not to compete with Borgas, Inc., one of the alleged co-conspirators, the admission of one of Electric Factory's partners that the purpose of the arrangement with Borgas "was to try to keep [them] from competing with each other", and "to stop [them] from fiercely competing", and threats by Larry Magid, one of Electric Factory's principals, directed to artists and management to induce their use of Electric Factory's promotion services. Plaintiff limited its claim for damages to the profits it would have received from two of the nine concerts in Pittsburgh, the February 3, 1978 and April 9, 1979 Civic Arena concerts by Parliament Funkadelic. Kresky requested damages of estimated profits of $22,000.
 
 
 6
 The jury returned a special verdict finding that Electric Factory had conspired to restrain trade in violation of section 1 of the Sherman Act, but had not violated section 2 of the Sherman Act; that plaintiff had suffered damages in the amount of $5,500; and that plaintiff had not violated the antitrust laws. Thereafter, plaintiff filed a motion for permanent injunctive relief. The court, relying on the evidence adduced at trial without a separate evidentiary hearing, entered a judgment which, inter alia, permanently enjoined Electric Factory "from entering into a conspiracy with concert artists whereby the artists agree to refrain from entering into promotional agreements with [Kresky Corp.] upon the threat of [Electric Factory] to refuse to promote the artists in the future at the Spectrum Arena in Philadelphia."
 
 
 7
 Electric Factory filed a motion for judgment n.o.v. which the court characterized as "challenging plaintiff's proof of the amount of the damage done." The district court granted the motion and vacated the damage award to plaintiff but left intact the permanent injunction against Electric Factory.
 
 III.
 A.
 Judgment n.o.v. on Damages
 
 8
 A judgment notwithstanding the verdict may be granted under Fed.R.Civ.P. 50(b) "only if, as a matter of law, 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.' " Dudley v. South Jersey Metal, Inc., 555 F.2d 96, 101 (3d Cir.1977). In considering a motion for judgment n.o.v., the court "must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." Inventive Music Ltd. v. Cohen, 617 F.2d 29, 31 (3d Cir.1980). On appeal, the appellate court should apply the same standard as the trial court in determining the propriety of a judgment n.o.v. Harwood & Associates, Inc. v. Texas Bank & Trust, 654 F.2d 1073, 1076 (5th Cir.1981).
 
 
 9
 An antitrust plaintiff seeking treble damages under section 4 of the Clayton Act must prove an antitrust violation, fact of damage or injury, and measurable damages. See Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1116 (3d Cir.1973), cert. denied, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). The scope of the fact of injury factor has proved most troublesome from an analytic standpoint. However, as we recognized in Van Dyk Research Corp. v. Xerox Corp., 631 F.2d 251, 255 (3d Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), fact of damage or injury requires that plaintiff show a nexus between the violation and the injury. As the Supreme Court explained in Zenith Radio Corp. v. Hazeltine, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1968):
 
 
 10
 [Plaintiff's] burden of proving the fact of damage under Sec. 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under Sec. 4 (emphasis in original).
 
 
 11
 In this case, the jury, in its answers to special interrogatories, found with respect to the section 1 claim both that "defendants entered into a combination or a conspiracy with others" amounting to an unreasonable restraint of trade, and that this combination or conspiracy "proximately resulted in injury to the plaintiff's business or property." The jury established the amount of damages as $5,500, which the court viewed as representing the profits earned by defendant on the two Parliament Funkadelic concerts.[1]
 
 
 12
 It is far from clear that Electric Factory has preserved the contention, which it presented at oral argument on appeal, that there was insufficient evidence to show a violation with respect to the two Parliament Funkadelic concerts. In its opinion, the district court stated that for the purposes of the motion for judgment n.o.v.: "[D]efendants concede plaintiff has proved a violation of the antitrust laws, that is the conspiracy between defendants and various black artists to prevent plaintiff from successfully bidding for the artists' services. Defendants further concede plaintiff has proved the conspiracy injured its business." Defendant contends it made no such concession. On the assumption that there was no such concession, we have reviewed the record and we conclude that the evidence was sufficient to support the jury's verdict in both respects.
 
 
 13
 Unlike many antitrust cases where there is no direct evidence that defendant ever overtly used its power or leverage, in this case a number of witnesses testified at trial or at depositions which were introduced at trial regarding threats or other forms of coercion by Magid to induce them to use Electric Factory's services. Larry Fitzgerald, the manager of the Brothers Johnson, testified as follows on cross-examination by defendant:
 
 
 14
 Q Mr. Fitzgerald, did you have any discussions with Mr. Magid concerning the performance of the Brothers Johnson in Pittsburgh under the auspices of Mr. Magid?
 
 
 15
 ....
 
 
 16
 A Mr. Magid, after hearing that Mr. Kresky would like to promote a Brothers Johnson show in Pittsburgh, called me following a telephone conversation with my agents, perhaps several conversations with my agents, wherein he strongly objected due to the fact that--well, I will rephrase. Mr. Magid stated that since he promoted the Brothers Johnson in Pittsburgh the year prior, he felt he was entitled to promote them again in the future and felt very strongly about it.
 
 
 17
 ....
 
 
 18
 Q Mr. Fitzgerald, did Mr. Magid, in the conversation that he had with you concerning the Brothers Johnson, mention his promoting the Brothers Johnson in Philadelphia?
 
 
 19
 A Yes.
 
 
 20
 Q Did he relate that to the performance of the Brothers Johnson date in Pittsburgh? Did he mention it in the same conversation? Could you relate to me, as best you can, what he, Mr. Magid, said to you in connection with the performance of the Brothers Johnson in Philadelphia?
 
 
 21
 A Mr. Magid said that he felt that he was entitled to the performance in Pittsburgh, and Mr. Magid felt so strongly about it that if for some reason he ended up not promoting the Brothers Johnson in Pittsburgh he would just as soon not promote them in other cities as well.
 
 
 22
 Tr. 352-54.
 
 
 23
 Charles Barnett, the booking agent for the Average White Band, which his agency had booked into Philadelphia to be promoted by a promoter other than Electric Factory, testified that Magid got angry and said "Tear up my card. I don't want to deal with your agency." Tr. 470-71.
 
 
 24
 Leo Leichter, agent for Dave Mason, a performer, testified that Magid telephoned him after learning he had booked Mason with another promoter in Philadelphia into the Tower Theater as an alternate to the Spectrum, and that Magid was quite upset because Leichter was dealing "with another promoter in his turf", Tr. 485, that Magid said, "No one comes into my turf", Tr. 488, and that in that telephone conversation Magid indicated, "He didn't want to do business with me again if the date were to be consummated with [the other promoter], or he indicated he wouldn't buy the act again." Tr. 485.
 
 
 25
 Derek Sutton, who manages rock and roll bands, testified that when Magid learned he wished his group, Procol Harum, to play in Philadelphia at the Tower Theater, Magid "responded angrily", telling him that since Magid "had played them several times in the past ... it would not be correct business procedure for the group to play for anyone else." Tr. 586. Magid also said he would approach a member of the band in order to discuss "the correctness of whether [it] should go with somebody else." Tr. 587.
 
 
 26
 There was testimony on behalf of defendant, including the testimony of Magid, which contradicted some of the above. Credibility, of course, was for the jury to determine. In fact, in a magazine interview in December 1976 which was admitted into evidence at trial, Magid admitted that, "In competition I may have used my muscle and power to excess. I play acts that other people want and I'm not giving too much room for other people to start. One of my earlier faults was that I was vindictive." Plaintiff's Exhibit No. 46.
 
 
 27
 Although defendant argued that evidence of threats which preceded the period in suit was irrelevant, the court overruled that objection. The Supreme Court has held that evidence of a conspiracy relating to events occurring prior to the period for which damages are sought is probative of the question whether an antitrust violation has occurred. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962).
 
 
 28
 We do not understand defendant to contend that there was insufficient evidence from which the jury could have found Electric Factory violated section 1 of the Sherman Act. The evidence summarized would amply support that finding. Thus we turn to the other two elements of a private antitrust damage action, fact of injury (i.e., causation) and amount of damages. It is not totally clear whether the district court granted the motion for n.o.v. because it found there was insufficient evidence of the fact of injury or of the amount of damages. There is language in the opinion susceptible of either construction.
 
 
 29
 In any event, when both issues are reviewed under the standard appropriate for a jury verdict (the narrowest review available), we conclude that judgment n.o.v. on either ground cannot be sustained. Turning first to whether plaintiff produced sufficient evidence to show defendant's antitrust violation proximately caused plaintiff's injury, the district court correctly stated in its discussion of plaintiff's "burden of showing the fact of injury" that the standard of causation requires only that plaintiff prove that defendant's illegal conduct was a material cause of its injury. The court continued "[P]laintiff need not prove that but for defendants' illegal conduct, he would have promoted some or all of the black-oriented, arena-size concerts in Pittsburgh during the appropriate period. Rather, the jury may conclude that the fact he was unable to even bid on some of them surely contributed to his failure to promote them." In fact, in awarding the permanent injunction, the district court expressly referred to, thereby apparently adopting, the jury's finding that defendant's antitrust conspiracy "proximately caus[ed]" damage to plaintiff's business and property.
 
 
 30
 The requisite causation, the link between defendant's activity in violation of the antitrust laws and plaintiff's inability to even bid for the concerts in question, was an inferential leap the jury was permitted to make in light of the evidence before it. "Any fact that the jury could have reasonably inferred from the evidence in favor of the verdict winner will be presumed to have been so inferred when the court reviews the evidence supporting the verdict." Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1099 (3d Cir.1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Some of Magid's conversations to which the witnesses testified occurred less than a year before one of the Parliament Funkadelic concerts at issue. The jury could have inferred either that Parliament Funkadelic had been the recipient of coercion similar to that exerted on other artists or that the knowledge of Magid's practices was sufficiently widespread in the industry that it induced Parliament Funkadelic to use Electric Factory's promotion services for the two concerts in question without giving plaintiff an opportunity to bid.
 
 
 31
 The plausibility of this inference was strengthened by evidence that the terms on which Electric Factory promoted the two Parliament Funkadelic concerts were considerably less favorable to the performers than usual for groups of that stature. Parliament Funkadelic performed both Pittsburgh concerts for Electric Factory without securing any guarantee, under an arrangement to split the profit on a 50-50 basis with Electric Factory. Kresky testified that only rarely will a group not receive a guarantee, and in that case the group will receive a 90-10 share of the profits. He stated that "99.9 percent of the times" a promoter must guarantee a deposit for the performer before a concert. In his experience, the only time a deposit is not guaranteed is when an artist is "looking to yield the lion's share of the profits--usually 90 percent of it." Tr. 82-83. Although this was a disputed issue, for purposes of this appeal we must resolve all factual disputes in favor of Kresky Corp., the recipient of the jury verdict. Viewed in that light, we conclude this evidence was sufficient to support the jury's express finding that defendant's antitrust violation was the proximate cause of plaintiff's injury.
 
 
 32
 It appears that the district court, which on one hand adopted the finding of proximate cause, imposed yet another causation requirement which it found had not been satisfied. The court stated that "when it comes to proving the damages plaintiff is entitled to receive in compensation for this injury, he may receive only those damages which directly flow from the violation" or which were "the direct and certain result" of the violation (emphasis added).
 
 
 33
 We can find no support for the district court's imposition of such a stringent causation requirement whether considered as an aspect of fact of injury or amount of damage. On the contrary, it has generally been held that once liability is established, plaintiff's proof of damages will be evaluated under a more lenient standard. See J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565-66, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); Van Dyk Research Corp. v. Xerox Corp., 631 F.2d at 255.
 
 
 34
 The evidence that Kresky Corp. would have promoted the two concerts in the absence of defendant's illegal conduct is far from overwhelming. Because Kresky Corp. had not been allowed to submit a bid at all, there was, of course, no evidence as to the terms of the bids for the two concerts. However, Kresky did testify that he had never offered terms as unfavorable as those given by Electric Factory to Parliament Funkadelic. From this the jury could reasonably have inferred that plaintiff's bid would have been at least more favorable than defendant's. Moreover, while there were other concert promoters in the Pittsburgh area, there was also evidence that Kresky Corp. was one of the largest and there was no evidence that any other promoter had attempted to submit a bid for the two concerts.
 
 
 35
 The absence of more specific evidence is in large part attributable to defendant's wrongful conduct, which resulted in no other bids for the concerts being made. As the Supreme Court has stated in explaining its "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury", "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. at 566-67, 101 S.Ct. at 1929 (quoting Hetzel v. Baltimore & Ohio Railroad, 169 U.S. 26, 39, 18 S.Ct. 255, 260, 42 L.Ed. 648 (1898) and United States Trust Co. v. O'Brien, 143 N.Y. 284, 289, 38 N.E. 266 (1894)). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery...." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).
 
 
 36
 Finally, there seems to be some suggestion in the district court's opinion that plaintiff should have used a different damage theory in its proof of the final element, amount of damages. The court said:
 
 
 37
 The damages he would be entitled to would be that percentage of the profits made by all promoters on all relevant concerts which he would have made absent defendants' antitrust violation. This is obviously impossible to exactly determine. However, it might be said that plaintiff enjoyed a particular percentage share of the remaining market in popular music concerts and, therefore, that he could be expected to enjoy a similar market share of the black-oriented, arena-size concert market and, therefore, that he would be entitled to a percentage of the profits earned on these concerts commensurate to that market share. See Zenith, supra; Bigelow, supra; and Eastman Co. v. Southern Photo Co., 273 U.S. 359 [47 S.Ct. 400, 71 L.Ed. 684] (1926). A damages formulation, such as this, takes into account the effects of lawful competition; plaintiff's formulation did not.
 
 
 38
 While the market share approach has been successfully applied in other cases, it is not the only one that can be used; plaintiffs must be free to select their own damages theories as long as they are supported by a reasonable foundation. As the Fourth Circuit has recently stated, the jury in an antitrust case "may not speculate, but, acting upon probabilities and inferences it may base its verdict on a just and reasonable estimate derived from relevant data." Wilder Enterprises, Inc. v. Allied Artists Pictures Corp., 632 F.2d 1135, 1142 (4th Cir.1980).
 
 
 39
 In summary, the jury could have reasonably found a causal nexus between defendant's wrongful conduct and plaintiff's failure to promote at least one of the Parliament Funkadelic concerts at issue. The district court's grant of the motion for judgment n.o.v. on the ground that "it cannot be said with certainty that plaintiff's failure to promote and earn profits on the two concerts ... was the direct and certain result of defendants' conceded antitrust violation" was inconsistent with the Supreme Court's reminder in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123-24, 89 S.Ct. 1562, 1576-77, 23 L.Ed.2d 129 (1969), that:
 
 
 40
 [D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."
 
 
 41
 We will, therefore, reverse the order of the district court granting defendant's motion for judgment n.o.v. and remand for reinstatement of the jury verdict on damages.B.
 
 Permanent Injunction
 
 42
 In its cross-appeal, Electric Factory challenges the district court's entry of a permanent injunction against it. The district court's final judgment of April 14, 1981 permanently enjoined defendants "from entering into a conspiracy with concert artists whereby the artists agree to refrain from entering into promotional agreements with the plaintiff upon the threat of defendants to refuse to promote the artists in the future at the Spectrum Arena in Philadelphia." In its subsequent opinion granting defendant's motion for judgment n.o.v. as to damages, the court left the injunction intact, on the ground that "[t]he fact that plaintiff is not entitled to an award of damages does not, however, deprive him of his judgment against defendants."
 
 
 43
 Defendant's contention that the district court was obliged to dissolve the injunction because it had overturned the damages verdict on what defendant argued was plaintiff's failure to prove causation must obviously now fail.[2] We have already concluded that plaintiff's proof of causation was sufficient to support the jury's verdict on damages.
 
 
 44
 Defendant further contends that the entry of the permanent injunction must be reversed because the district court failed to comply with the requirements of Fed.R.Civ.P. 52(a) and 65(d). Rule 52(a) provides, in relevant part, that:
 
 
 45
 In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action.
 
 Rule 65(d) provides that:
 
 46
 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.
 
 
 47
 In this case, the parties agreed that a separate evidentiary hearing on the issue of injunctive relief was unnecessary, and that the district court could rely on the evidence adduced at trial in determining the propriety of an injunction. Brief for Electric Factory at 3. Defendant contends, however, that the court's judgment merely reciting the jury's finding "that defendants [had] conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act ... thereby proximately causing damage to plaintiff's business and property" was insufficient to satisfy the requirements of Rules 52(a) and 65(d).
 
 
 48
 Defendant concedes it failed to raise this argument before the district court. We will not ordinarily consider issues which the parties have failed to raise below. Bethlehem Mines Corp. v. UMW, 494 F.2d 726, 735 (3d Cir.1974). This is particularly true where, as here, the defect complained of could have been readily corrected had the matter been called to the district court's attention. Although defendant correctly asserts that Rule 52(a)'s requirement of specific findings of fact and conclusions of law is mandatory, the authorities cited do not support defendant's contention that this defect cannot be waived.[3] The purpose of Rule 52(a) is to assist the appellate courts in fulfilling our review function, see Berguido v. Eastern Air Lines, Inc., 369 F.2d 874, 877 (3d Cir.1966), cert. denied, 390 U.S. 996, 88 S.Ct. 1194, 20 L.Ed.2d 95 (1968). The requirement is not jurisdictional, see Rossiter v. Vogel, 148 F.2d 292, 293 (2d Cir.1945), and hence does not differ from any of the other trial court errors which are waived when no objection is raised in the district court.
 
 
 49
 Because we conclude that defendant waived any objection to the form of the injunction and because the record provides a sufficient basis for us to fulfill our review function, we need not decide whether the specific requirements of Rules 52(a) and 65(d) were satisfied in this case. We note, however, that the only specific defect to which defendant points is the absence of any finding by the district court of the threat of future injury, as distinguished from the fact of past injury. Although section 16 of the Clayton Act provides for injunctive relief against "threatened loss or damage by a violation of the antitrust laws" (emphasis added), the requisite finding of the threat of future injury need not be explicit, but may be inferred in an appropriate case from the court's grant of an injunction. See SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir.1975).
 
 C.
 Conclusion
 
 50
 For the foregoing reasons, the judgment of the district court permanently enjoining defendants from entering into a conspiracy with concert artists whereby the artists agree to refrain from entering into promotional agreements with plaintiff upon threat of refusal to promote the artists at the Spectrum will be affirmed. The grant of defendant's motion for judgment n.o.v. will be reversed, and the case remanded for reinstatement of the jury's verdict as to damages.
 
 
 
 [1]
 Plaintiff had estimated that defendant earned a profit of $22,000 for the two Parliament Funkadelic concerts, a figure arrived at by taking approximately 13%-15% of the gross ticket sales per concert which Kresky testified was the "generally accepted" profit of a promoter. Plaintiff has suggested that the jury arrived at the $5,500 damage figure by concluding that plaintiff lost only one concert by reason of defendant's violation and awarded damages equal to one-half the profit of one concert by taking into account Kresky's testimony that plaintiff would have co-promoted the concert
 
 
 [2]
 Defendant relies on the language of section 16 of the Clayton Act which provides that "Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. Sec. 26 (1976) (emphasis added). Dictum in Van Dyk Research Corp. v. Xerox Corp. suggests that "fact of injury" must be shown both for a claim for damages and for injunctive relief. 631 F.2d at 255 n. 2. We do not read this language to vary from the generally accepted principle that "[a] cause of action for injunctive relief under Section 16 does not require a showing of injury to business or property but imposes a lower threshold requirement--that there be a 'threatened loss or damage' to the plaintiff." L. Sullivan, Handbook of the Law of Antitrust 772 (1977)
 
 
 [3]
 The dictum in Berguido v. Eastern Air Lines, Inc., 369 F.2d 874, 877 (3d Cir.1966), cert. denied, 390 U.S. 996, 88 S.Ct. 1194, 20 L.Ed.2d 95 (1968), was apparently the genesis of the statement in 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2574 (1971), that the requirement of Rule 52(a) cannot be waived. However, the issue in Berguido did not concern waiver but whether the court on appeal could ascertain the basis for the decision. We affirmed the district court's judgment notwithstanding the abbreviated order, stating, "The basis of the Court's ruling is clear....", after finding on examination of the record that there was substantial support for it. 369 F.2d at 877. Similarly, in H. Prang Trucking Co., Inc. v. Local Union No. 469, 613 F.2d 1235, 1238-39 (3d Cir.1980), we remanded for further findings but only after concluding that the findings were inadequate to explain the basis for the ruling or to permit meaningful review. Accord Waialua Agricultural Co. v. Maneja, 178 F.2d 603, 608 (9th Cir.1949), cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950). In some of the other cases relied on by defendant, the district courts properly refused a party's request to forego the findings of fact required under Rule 52(a). See United States v. One Assortment of 25 Firearms, 483 F.Supp. 16, 18-19 (E.D.Tenn.1980); Lee v. Walworth Co., 1 F.R.D. 569, 571 (S.D.N.Y.1940). These hardly support the defendant's proposition that it is entitled to a remand on this issue notwithstanding its failure to raise it below