VAN DYK RESEARCH CORPORATION, a body corporate of the State of New Jersey, Appellant,

v.

XEROX CORPORATION, a body corporate of the State of New Jersey.

No. 79–2422.

United States Court of Appeals, Third Circuit.

Argued June 11, 1980.

Decided Sept. 30, 1980.

James R. McAlee (argued), Peter K. Bleakley, J. Bradway Butler, Lawrence C. Maisel, James A. Beat, Peter T. Grossi, Jr., Leonard B. Simon, Chris R. Ottenweller, Arnold & Porter, Washington, D. C., Pitney, Hardin & Kipp, Morristown, N. J., Alfred H. Hoddinott, Jr., Stamford, Conn., for appellee.

Robert G. Levy (argued), Berryl A. Speert, Allan P. Hillman, Jacob Silverman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for appellant.

Before HUNTER, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The plaintiff claims damages from the defendant Xerox Corporation, asserting that it violated the antitrust laws in the development and marketing of plain paper copiers. The district court found that the plaintiff failed to establish liability. We review only the finding that the plaintiff did not prove the fact of injury and, concluding that the district court's determination is supported by the record, affirm.

Van Dyk filed a complaint against Xerox in the United States District Court for the District of New Jersey, alleging violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and § 3 of the Clayton Act, id. § 14. The latter claim was abandoned before trial. After a bench trial, the district court found no transgression of the antitrust laws and further, even assuming violations, no adequate proof of injury or damages. Accordingly, judgment was entered for the defendant.

I

The district court's findings of fact establish the pertinent background.[1] In 1947 Xerox (then the Haloid Co.) received a license from the Battelle Memorial Institute to make, use, lease, or sell products comprising the inventions in electrophotography patented by Chester F. Carlson in the early 1940's and licensed by him to Battelle. Between 1949 and 1962, Xerox and Battelle worked closely on research and development of the new process in close cooperation with Carlson. Additional patents were secured during this period.

In 1956 and 1959, Battelle assigned all of its xerographic patents to Xerox in exchange for stock. Also in 1956, Xerox and Rank of England concluded an agreement on the formation of a joint venture, Rank Xerox, which was given an exclusive license to manufacture and sell xerographic equipment outside the United States and Canada. Rank Xerox granted licenses to Fuji Xerox in 1960 to sell and manufacture such equipment in Japan and other far eastern countries.

Xerox developed prototypes of the Model 914 and the Model 813 in 1958. These were revolutionary, compact office copiers utilizing plain paper rather than the specially prepared "coated" paper then generally used in machines manufactured by other companies. After IBM rejected an offer to manufacture and market the 914 and 813, Xerox decided to proceed on its own. Since the direct production cost of the 914, apart from research and development, was in excess of $2,000 per unit, Xerox decided to lease the machines. The leases were terminable on 15 days' notice and provided for a monthly minimum rent as well as a charge for each copy.

---

1. The trial required 24 days and the testimony of 39 witnesses. The trial judge's opinion included 391 findings of fact and applicable legal discussion. It is reported at 478 F.Supp. 1268 (D.N.J.1979).

The 914 competed against a number of models that used a variety of processes to copy material on coated paper, including machines manufactured by Kodak and Minnesota Mining and Manufacturing. The 914, however, was so successful that by 1965 Xerox had captured 80% of the United States market in plain and coated paper copiers.

In 1965 and 1969, Xerox introduced the 2400 and the 3600, respectively, models that produced copies at a rate much faster than previous units. The Model 7000, which was able to reduce a copy in size, was introduced in September 1969.

IBM entered the plain paper copier market in 1970 with its Copier I, and Xerox immediately began patent litigation. The Copier I was followed by a number of Japanese products, primarily low volume machines, and in the mid–1970's both IBM and Kodak were producing high–speed copier/duplicators. By 1974 there were 14 companies other than Xerox marketing plain paper copiers in the United States, and four years later Xerox faced competition from at least 38 plain paper models.

During this period, Xerox developed new units featuring duplexing (the ability to copy on both sides of a sheet of paper), automatic feeder systems, and other refinements. One machine was capable of making 120 copies per minute. Coated paper technology also was improving in the 1960's and 1970's, and offset duplicators began to appear in compact, automatic form suitable for general office use.

In 1968, the Van Dyk Company, which had been organized for about 4 years, acquired a small facility in Hackettstown, New Jersey to develop a prototype plain paper copier that would compete with Xerox. The following year, Van Dyk went public with a stock offering underwritten by Mayflower Securities, Inc., a small investment banking firm. The offering was oversubscribed and yielded over 2.1 million dollars despite a warning in the prospectus that Xerox had over 1,000 patents on the xerographic process and patent litigation might preclude Van Dyk from manufacturing its proposed copier.

The proceeds of the offering were used to develop the Van Dyk Model 4000, which was exhibited in 1971. In the next year, Mayflower arranged a second stock issue that yielded an additional 3.6 million dollars. This offering also was oversubscribed, although Van Dyk did encounter some difficulty in negotiating loans from several large financial institutions because of concern about Xerox's strong position in the field.

Van Dyk acquired a facility in Parsippany, New Jersey and began commercial production of the 4000 in 1973. This model was a somewhat faster, slightly improved version of the Xerox 3600, which by that time had been taken out of production. Although the 4000 did possess some technological innovations, it did not have an automatic feed system, copy size reduction, or duplexing capability. The Van Dyk model was designed, marketed, and priced to compete at the higher volume end of the copier/duplicator market in competition with offset duplicators as well as coated and plain paper machines.

Van Dyk pursued several alternatives in its marketing efforts. Rather than emphasize outright sales, it planned a rental program and for this purpose arranged a 3 million dollar line of credit with a bank. That line of credit, however, was never utilized. During 1971 and 1972, the company had discussions with various foreign and domestic firms interested in marketing the 4000. In 1973 the Apeco Co., which sold coated paper copiers, approached Van Dyk to explore the possibilities of a joint venture.

What began as a marketing proposal culminated in a merger agreement. On May 10, 1973 a formal agreement was executed providing for an exchange of stock, Apeco to be the surviving corporation responsible for obtaining financing to develop and market the 4000, mainly by lease. As an additional part of the agreement, Apeco loaned Van Dyk 5 million dollars to complete the facility at Parsippany, New Jersey. In September 1973, after the stockholders of both

companies had approved the merger, Van Dyk learned that Apeco's financial condition was precarious and withdrew. Van Dyk later sued for several million dollars, alleging that it had been induced by Apeco to make substantial commitments resulting in large damages.

Van Dyk then investigated the possibility of a third public offering through Mayflower. That underwriter, however, was unable to proceed because of a pending Securities and Exchange Commission investigation. In subsequent litigation, Van Dyk alleged that Mayflower's fraudulent concealment of the SEC proceedings caused a delay in obtaining operating capital, thereby damaging Van Dyk.

Van Dyk tried yet another tack. In December 1973 it agreed upon a marketing arrangement with the SCM Corporation providing for the sale of 2,200 Model 4000 copiers over a period of twenty-four months. The machines were to be marketed by SCM under its own trade mark, and it was understood that the two firms would be in competition. In order to meet its commitment to SCM, Van Dyk did not develop its own marketing organization as energetically as it otherwise would have.

SCM cancelled the contract in January of 1975, having purchased only 1,225 of the 2,200 units it had agreed to buy. Van Dyk's efforts to raise more money during 1974 met with mixed results. It was able to secure a 2.5 million dollar line of credit from several banks, but a 10 million dollar convertible debenture offering foundered because of deteriorating money markets.

With the cancellation of the SCM contract, Van Dyk was faced with a large number of machines coming off the production line, only a small direct sales force, and a cash flow inadequate to pay parts suppliers. Another attempt at a public offering in mid-1975 was not successful, and, in October of that year, Van Dyk filed for an arrangement under Chapter XI of the Bankruptcy Act.

In the district court Van Dyk contended that Xerox monopolized the plain paper copier market or submarket by (i) abusing the United States patent system, (ii) creating a "rental only" market environment to frustrate competition, (iii) participating in an international cartel with Rank Xerox and Fuji Xerox to divide world markets and pool member patents illegally, and (iv) engaging in exclusionary marketing practices.

The district court defined the relevant market as a continuum including plain paper, coated paper, and offset technologies and found that Xerox's share of this market, 35%, would not support the inference that it possessed monopoly power. Furthermore, Xerox had not achieved or maintained its position in the market by unlawful, exclusionary conduct. The court stated that the plaintiff failed to establish that Xerox abused the patent system, created or maintained a rental only market to frustrate competition, entered into an illegal cartel, or engaged in exclusionary marketing practices.

In addition, the court held that even if antitrust violations had been shown, the plaintiff was not entitled to recover because it did not establish that it was injured by any of the defendant's allegedly unlawful conduct, did not sustain its burden of proving that the damages it claimed to have suffered were causally related to such conduct, and did not provide the court with a reasonable estimate of its damages.

Specifically, the court found that Xerox had nothing to do with the Mayflower, Apeco, or SCM events, nor did the defendant by any unlawful conduct prevent Van Dyk from securing adequate financing.

II

We have abbreviated substantially the facts and procedural history of the case because we choose to rest our affirmance on the plaintiff's failure to show a causal relationship between its injury and the alleged antitrust violations. Because this is dispositive of the appeal, we do not discuss Van Dyk's other contentions.

Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), allows recovery only to a plaintiff who is injured "by reason of" a

violation of the antitrust laws. The plaintiff has the burden of proving that the established illegality was a material cause of the injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969). As we said in *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir.), cert. denied, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), "[e]ven if a defendant's acts are shown to be violative of the statute, . . . a plaintiff may not recover unless a nexus to its own injury is also demonstrated." *Id.* at 98. Similarly, in *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973), the district court directed a verdict for the defendant at the conclusion of the plaintiff's case because the evidence demonstrating the connection between the alleged antitrust violations and the damages was too speculative to submit to the jury. *Id.* at 1114. We affirmed, agreeing that although there was testimony about various reasons that might have caused the plaintiff's losses, no specific cause was assigned by the plaintiff's expert. *Id.* at 1117.

The requirement that a plaintiff be injured in fact is closely associated with standing to bring an antitrust suit. II P. Areeda & D. Turner, Antitrust Law ¶¶ 334a, 335a, 335b, 335c, 343 (1978). But in this case the concept plays another role. It is not enough that the public has been harmed by a violation of the antitrust laws. The plaintiff seeking to recover treble damages must further establish as a matter of proof that the illegal conduct was a material cause of its injury. *Rea v. Ford Motor Co.*, 497 F.2d 577, 589–90 (3d Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); L. Sullivan, Handbook of the Law of Antitrust § 251 (1978). In this case, then, Van Dyk had to prove that Xerox was a material cause of its financial difficulties, assuming *arguendo* that Xerox's activities violated the antitrust laws.

It also is necessary to bear in mind that the evidence linking illegality and injury must be more precise than that needed to establish the amount of damages. *Rea v. Ford Motor Co.*, supra. In the latter context, the Supreme Court has held that the fact finder is allowed to act upon probable and inferential, as well as direct and positive proof. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–66, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263–65, 66 S.Ct. 574, 579–580, 90 L.Ed. 652 (1946); see *Zenith Radio Corp. v. Hazeltine Research, Inc.*, supra, 395 U.S. at 123–25, 89 S.Ct. at 1576–77. Although the district court also found that the plaintiff failed to meet the more lenient test in proving the amount of damages, we confine our review to the issue of fact of injury.[2]

The plaintiff seeks to recover the profits it estimates would have been earned had the defendant's allegedly illegal conduct not occurred. One of the plaintiff's expert witnesses testified as to this amount. To support the expert's damage projection Van Dyk would have needed to attract 37 to 40 million dollars over a four year period. Appellant's Brief at 54 n.68. Another witness, an expert in the field of foreign and domestic investment and risk markets, testified that Van Dyk would have been able to raise that amount in the absence of Xerox's allegedly unlawful action. As recited in plaintiff's brief, the offending conduct was the establishment of a rental only market and Xerox's use of its patent portfolio to discourage investment in fledgling enterprises, particularly small ones like Van Dyk.

The plaintiff argues that the effect of the rental only policy was to make large capital investment necessary and preclude sales

---

**2.** Although the plaintiff also asked for injunctive relief in its complaint, the district court did not discuss that aspect of the case in its findings and opinion. On appeal, the plaintiff has not raised the issue, and we therefore assume that it is no longer in the case. In any event, although injunctive relief may be appropriate where damages are not, in the circumstances present here, the failure to prove the fact of injury is conclusive as to both forms of relief. See *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 668 n.2, 670 n.14 (D.C. Cir. 1977).

revenue needed for adequate cash flow. To establish a more direct injury, however, Van Dyk focuses on Xerox's alleged misuse of its patents by threatening infringement suits to discourage investment in rival firms.[3] Two additional experts testified that Van Dyk was unable to obtain the capital it needed because of the investor disinterest this practice generated.

This theory of causation was unequivocally rejected by the district court. It pointed out that in early efforts Van Dyk had been able to secure financing despite the formidable problems presented by Xerox's strong position in the market. The court specifically found that "Van Dyk failed to prove that it was prevented from securing adequate financing by any alleged unlawful conduct of Xerox, whether it be the so—called 'rental only' policy, Xerox' patent policy, or Xerox' other alleged exclusionary activities." 478 F.Supp. at 1327.

According to Van Dyk's vice president, after termination of the Apeco merger agreement the company found itself in a situation of "urgent financial necessity." It had machines and production capacity but lacked the marketing and distribution facilities to bring in the necessary cash. At that point, the combination of Mayflower's inability to undertake further offerings and the unfavorable money market conditions were serious detriments to Van Dyk's cash–starved position.

The arrangement with SCM provided temporary relief, but at a cost. In order to meet its commitments to SCM, Van Dyk slowed its efforts to augment its own sales force. Consequently, when SCM cancelled the contract with almost a year remaining, Van Dyk was caught in a squeeze. It had to maintain substantial production, but although moderately successful in placing machines with customers, its distribution network simply was not enough to bring in the cash required to pay parts suppliers. Van Dyk was running out of money at a time when it was in exceptionally short supply.

These findings of fact cannot be characterized as clearly erroneous and adequately support the conclusion that Van Dyk's financial woes were not caused by any unlawful conduct of the defendant. It is true that competition from Xerox, IBM, Kodak, and other American companies, as well as a number of Japanese concerns, did not make life any easier for Van Dyk. But more than the existence of vigorous competition is required to establish the right to antitrust damages. Van Dyk was unable to meet its burden of establishing the requisite causal connection between injury and the alleged violations.

It is apparent that Van Dyk produced a machine that offered Xerox potential competition. But for the series of mishaps that befell it, Van Dyk might have captured a reasonable share of the market. But as we have noted, it cannot be said that the trial court clearly erred in finding that Xerox was not responsible for Van Dyk's financially emaciated condition. It is to be expected, even in the absence of antitrust violations, that every fledgling enterprise will experience difficulties in entering a market against well established and knowledgeable competitors, and Van Dyk had more than its share. The disastrous failure of the Apeco merger, the SEC investigation that disabled Mayflower, and the cancellation of the SCM contract, all occurring during a period of tight money, were simply more than Van Dyk could endure. Just because this misfortune inured to Xerox's benefit, however, does not make that company liable for the damage caused.

We conclude that Van Dyk failed to establish a right to recovery, and, accordingly, the judgment of the district court will be affirmed.

SLOVITER, Circuit Judge, concurring.

I write separately to underscore the posture in which this case has reached this

---

3. In 1975, pursuant to a consent agreement with the Federal Trade Commission, Xerox offered licenses to use certain of its inventions. See SCM Corp. v. Xerox Corp., 463 F.Supp. 983, 994 (D.Conn.1978), remanded, 599 F.2d 32 (2d Cir. 1979), on remand, 474 F.Supp. 589 (D.Conn.1979), appeal docketed, No. 79–7017 (2d Cir. June 4, 1979). However, patent litigation between the parties is presently pending in the District of New Jersey.

court, and thus the limited scope of our review. In support of its claim that "Van Dyk . . . failed because Xerox' twin exclusionary practices [the maintenance of a 'rental only' market and exclusionary patent practices] discouraged investment in a small firm [Van Dyk]", Van Dyk introduced evidence intended to prove that potential investors and lenders failed to invest in Van Dyk or to provide financing needed by Van Dyk because of the possibility of patent litigation by Xerox and because of the large capital requirements needed by Van Dyk to compete in the rental market created by Xerox' rental–only practices. Van Dyk's evidence consisted, inter alia, of testimony of persons specializing in private placement and investment banking and the testimony of one of plaintiff's principals that banks and investors had expressed that concern and reluctance. In addition, there was documentary evidence from which one might infer the requisite causal nexus. Thus, for example, there was evidence that a major bank refused to participate in a loan because of the "indefinite" aspect of marketing leased equipment and the patent situation. This evidence was sufficient to permit the trier of fact to make the causal connection suggested by Van Dyk and would have supported a jury verdict for damages, assuming that Van Dyk surmounted the hurdles of proving liability and producing sufficient evidence from which a reasonable damage calculation could be made.

Thus, this case does not fall within the precedent of the cases cited by the majority in which plaintiffs failed to produce sufficient evidence of a nexus between the claimed violation and the claimed injury to warrant submission to a trier of fact. In *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), this court sustained summary judgment for a defendant because plaintiff failed to develop a theory or to set out any facts that would show a causal link between the defendant's acts and the plaintiff's losses. Similarly, in *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir.), *cert. denied*, 414

U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973), we sustained the direction of a verdict for defendant because plaintiff had failed to produce evidence concerning a crucial element of its own causation theory. In this case, on the contrary, plaintiff's case was not deficient in the quantum of evidence needed to present the issue of fact to the jury.

Plaintiff, however, submitted the case to the court as a trier of fact instead of to a jury. After consideration of the evidence produced by both parties that factors other than those posited by plaintiff were responsible for plaintiff's financial difficulties, the court concluded that:

> Van Dyk failed to demonstrate that Xerox' activities have had an adverse impact on Van Dyk's ability to market the Van Dyk 4000 or to obtain financing and failed to demonstrate any causal relationship between Xerox' patent policies, its relationship with Rank and Fuji, its marketing practices (including pricing and rental policies) or any other Xerox activities, and Van Dyk's present financial distress.

*Van Dyk Research Corp. v. Xerox Corp.*, 478 F.Supp. 1268, 1315 (D.N.J.1979).

It is, I believe, important to distinguish our function in review of entry of summary judgment or a directed verdict where the trial court acted as a barrier to the jury's evaluation of the evidence, and our review of the findings of fact of a district court where the judge acted as the trier of fact after evaluation of the evidence. In the latter instance, we are bound by Rule 52(a) of the Federal Rules of Civil Procedure which provides, in part, that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We must accept the ultimate fact findings of the trial court unless its determination is completely devoid of "minimum evidentiary support displaying some hue of credibility" or "bears no rational relationship to the supportive evidentiary data." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 887

(3d Cir. 1975). In view of the evidence in this case of the depressed condition of the money market, the deteriorating condition of the securities market, and the other factors referred to in the majority opinion, I agree with the majority that we cannot find as "clearly erroneous" the court's finding that these factors rather than the reasons posited by plaintiff were responsible for Van Dyk's financial ills.

For these reasons, I do not believe our analysis of this issue is helped by reference to "fact of injury." There has been a recent tendency by some courts to view "fact of injury" or "fact of damage" as imposing a burden on antitrust plaintiffs in addition to that of proving liability and damage. These terms have sometimes been viewed as code for the standing requirement and sometimes to signify that the injury complained of is not cognizable under the antitrust laws. There is no justification in the statute, policy or operative precedent to require an antitrust plaintiff to meet a burden of proving "fact of injury" which is somehow different from proof of an antitrust violation and legally cognizable damages flowing therefrom.

On the other hand, there are patently justifiable reasons why a trial court should ascertain, before embarking on a lengthy antitrust trial, whether plaintiff will be able to present some evidence that the injury of which it complains can be attributable to the alleged antitrust violation. When "fact of injury" is used in this sense, it is merely synonymous with causation and is unobjectionable, if imprecise, since it is compensable injury that is lacking rather than the injury itself. Once the antitrust trial has been completed, there is no longer any reason to speak of "fact of injury". Then, if the plaintiff does not prevail for this reason, it is not because plaintiff has failed to show the existence of damage, but because the plaintiff has failed to show that the damage is caused by the defendant's antitrust violation. The district court clearly observed the appropriate connection when it found "the plaintiff, in proving the fact of injury, must prove a direct and proximate causal connection between an alleged unlawful act and the plaintiff's alleged injury." 478 F.Supp. 1326.

I understand the majority to use "fact of injury" as synonymous with causation, and, as indicated above, agree that the trial court could find that plaintiff in this case failed to prove the alleged causation.