**THE PROCTER & GAMBLE COMPANY, Plaintiff and Counterclaim Defendant,**

v.

**PARAGON TRADE BRANDS, INC., Defendant and Counterclaimant.**

### No. CIV. A. 94–16 LON.

United States District Court, D. Delaware.

March 28, 1996.

---

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, DE, of counsel: John F. Sweeney, Richard C. Komson and Seth J. Atlas of Morgan & Finnegan, New York, New York, Charles E. Buffon, Timothy C. Hester and Salvatore G. Rotella, Jr., of Covington & Burling, Washington, DC, for The Procter & Gamble Company.

James M. Mulligan, Jr. of Connolly Bove, Lodge & Hutz, Wilmington, DE, of counsel: Stephen B. Judlowe, Dennis J. Mondolino, Porter F. Fleming, Michael F. Hurley, of Hopgood, Calimafde, Kalil & Judlowe, New York City, for Paragon Trade Brands, Inc.

## MEMORANDUM OPINION

LONGOBARDI, Chief Judge.

### I.

The Procter & Gamble Company ("P & G") has filed suit against Paragon Trade Brands, Inc. ("Paragon"), alleging that Paragon infringes P & G's patent rights to the barrier leg cuff feature on disposable diapers. Paragon has counterclaimed for the alleged infringement of a patent relating to diaper absorbent cores[1] and for a

---

1. Paragon's patent infringement counterclaim was dismissed without prejudice for lack of

violation of the antitrust laws. Pending before the court is P & G's Motion for Summary Judgment on Paragon's Antitrust Counterclaim. (D.I.182).

P & G is the largest disposable diaper manufacturer in the United States. At the close of 1994, P & G accounted for 38% of the disposable diaper sales in the United States. P & G sells its diapers under the PAMPERS and LUVS brand names.

Kimberly–Clark Corporation ("K–C") is the second largest producer of disposable diapers, with a 32% share of the market. K–C produces the HUGGIES brand of diapers.

Paragon is the largest of the "private label" disposable diaper producers. Private label producers manufacture diapers which are sold under the names of retailers, rather than under the name of the producers. The three largest private label manufacturers[2] of disposable diapers account for approximately 20% of the national disposable diaper market.[3]

Historically, P & G and K–C have led technological innovation in the disposable diaper market. P & G has been granted more than 250 U.S. patents on technology relating to disposable diapers. K–C holds even more. Technological innovation by P & G and K–C typically has resulted in higher product quality which, when coupled with promotional activities, have allowed P & G and K–C to charge a premium price for their diapers. Although P & G's diaper business and its individual diaper brands have been profitable throughout the 1990's, it has recently been losing market share. Private label manufacturers, who offer lower priced diapers, have experienced a significant gain in their share of the market over the past 20 years.

The technological innovations of P & G and K–C have spawned numerous intellec-

tual property disputes. Throughout the mid–1980's and continuing through the early 1990's, P & G and K–C were "at each other's throats." (D.I. 186, Tab 12, B 100). Between 1985 and 1992, P & G spent more than $28 million worldwide in outside legal expenses for patent litigation against K–C. As of May 1, 1992, P & G and K–C were involved in seven different pending lawsuits and two patent interference proceedings involving disposable diapers.

On May 1, 1992, P & G and K–C entered into an agreement which settled a number of patent disputes and granted each other worldwide immunity from suit regarding the patents covered by the agreement. No royalties were assessed under the agreement, but P & G was required to pay K–C $17 million. The agreement reserved to P & G and K–C the right to make their own decisions about licensing their respective patent rights. As for unforeseen patent disputes, the parties agreed to "exert their best efforts to resolve [them] by negotiation in good faith" and if negotiation failed, then to "seriously consider other forms of alternative dispute resolution." Rather than settling each individual patent battle, P & G and K–C sought to end the litigation war and to prevent future hostilities.

A second agreement between P & G and K–C was executed on September 3, 1993. Again, the parties to the agreement granted each other worldwide immunities from suit under various patents. Under this agreement, no monetary payment was required. No royalties for the use of the technology were assessed.

James Johnson, P & G's Senior Vice President and General Counsel, testified in his deposition that the patents included in the agreements were "either cases that were currently in litigation or disputes re-

---

standing. *See* (D.I.201).

**2.** This category, as it is being used by the court, also includes regional brand manufacturers.

**3.** P & G has set forth by competent evidence that Paragon itself has a market share of approximately 17%. Paragon has produced no evidence that would lead the court to believe that figure to be in error.

lating to patents in which there was a question as to who invented the technology first." (D.I. 184, Tab 22, A 233).

Paragon asserts that fourteen patents covered by the 1992 agreement[4] and twelve patents covered by the 1993 agreement[5] were not the subject of any bona fide dispute between P & G and K–C. (D.I. 186 at 10–11). The factual basis for Paragon's assertion is that there were neither allegations of infringement between P & G and K–C nor other communications regarding those patents prior to the negotiations which led to the agreements. (D.I. 186 at 10–11, 28–29).

P & G admits that the agreements covered both actual disputes that had arisen and potential disputes that were likely to arise in the future. (D.I. 185, Tab 26, A 323). Stephen Miller, one of the two P & G patent lawyers principally involved in negotiating and drafting the settlement agreements, testified at his deposition that each of the patents assailed by Paragon as not being the subject of any bona fide dispute was in fact the subject of an actual or potential dispute. For example, Paragon has argued that P & G's Dragoo patent was made part of the agreement "even though [P & G] had not raised an infringement issue!" (D.I. 186 at 28–29). Mr. Miller testified that K–C raised the issue of the Dragoo patent during the March 1992 negotiations which led to the May 1992 agreement. (D.I. 185, Tab 26, A 322). Apparently, K–C's fear was that once P & G and K–C settled several other patent disputes related to the barrier leg cuff feature, P & G could "just go off and sue them under Dragoo." (D.I. 185, Tab 26, A 322). P & G had similar fears about other patents. Mr. Miller explained that P & G "wanted to get all of these on the table so that there were no hard feelings that in six months, somebody was going to turn around and sue the other party on this

closely related patent." (D.I. 185, Tab 26, A 323).

Paragon points to no evidence in the record, and the court has found none, that could lead a reasonable jury to the conclusion that the 1992 and 1993 agreements included patents which neither were the subject of a dispute nor were the foreseeable subject of a dispute. Indeed, the court does not read Paragon's brief to argue any such point. The parties essentially agree that the 1992 and 1993 agreements contained worldwide immunities from suit for patents for which no charges of infringement had been made but which could have been the basis for intellectual property disputes between P & G and K–C in the future.

During the period of negotiations leading to the 1992 agreement between P & G and K–C, P & G informed Paragon that products which incorporated the barrier leg cuff feature infringed P & G's patents. After the agreement was signed, Paragon received a similar notice from K–C. The agreement effectively enabled P & G and K–C to redirect their resources and patent enforcement strategies toward Paragon and the other private label manufacturers.

In conjunction with the infringement charges, P & G demanded a 2.5% royalty rate based on Paragon's net sales for a license to the barrier leg cuff patents. K–C made a similar offer to grant a license to Paragon, using 2.5% as a base rate which decreased to a 1% and .5% marginal rate at certain levels of sales.[6] P & G's decision to offer the license at the 2.5% rate was not based on any agreement or discussions between K–C and P & G. (D.I. 185, Tab 26, A 360).

Paragon asserts that P & G increased its patent applications, aggressively enforced its patent rights against private label manufacturers, made major price cuts, decreased diaper package sizes, targeted

---

4. These are listed at D.I. 186 at 28.

5. These are listed at D.I. 186 at 29.

6. Earlier, K–C had offered 3% to Weyerhaeuser, Paragon's predecessor.

marketing strategies to particular geographies, and repositioned LUVS to compete with private label manufacturers. These actions were alleged to be components of a plan to increase the costs and lower the profit margins of the private label manufacturers. Paragon alleges that these actions were also designed to delay the introduction of new diaper technology by the private label manufacturers.

One of Paragon's complaints is that P & G decreased the size of the diaper packages to increase Paragon's costs. Decreasing package size is known as downcounting. Downcounting holds no benefits for the consumer. Downcounting is a tactical move designed to give P & G an advantage over private label manufacturers because the private label manufacturers feel compelled to follow the downcount despite the greater costs associated with the changes in their private label customers' individual packaging.

## II.

The Sherman Act contains a basic distinction between concerted action and independent action. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Section 1 of the Sherman Act, 15 U.S.C. § 1, reaches unreasonable restraints of trade caused by a "contract, combination . . . or conspiracy" and does not regulate wholly unilateral conduct. *Id.* at 768, 104 S.Ct. 2731. Section 2 of the Sherman Act, 15 U.S.C. § 2, governs the conduct of a single entity. *Id.* at 767, 104 S.Ct. 2731.

Paragon's counterclaim includes both Section 1 and Section 2 allegations. Paragon claims that "P & G has entered into agreements and arrangements concerning competing patent rights creating a patent pool and discriminatory licensing venture" in violation of the antitrust laws. (Paragon Counterclaims ¶ 18). The court interprets these allegations as a Section 1 challenge. Specifically, the court understands Paragon to allege that the written 1992 and 1993 agreements have created a "pat-

ent pool" which constitutes an unreasonable restraint of trade. In addition, Paragon alleges that there was an informal, unwritten expansion of that agreement to charge the private label manufacturers an excessive licensing fee for the use of the patents subject to the agreement.

Paragon makes a separate allegation that is best interpreted as a Section 2 claim. Paragon claims that P & G has "a wrongful policy of soliciting and obtaining United States letters patents which are excessive in number and virtually inextricable from each other and from the prior art." (Paragon Counterclaims ¶ 19). This patent "thicket" allegedly has the effect of decreasing competition and creating barriers to entry and continued participation in the market. (Paragon Counterclaims ¶ 19).

## III.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the non-moving party. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While the moving party has the burden initially of identifying that evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of every element necessary to its case and on which it bears the burden of

proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987). Credibility determinations are not the function of the judge; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. 242, 106 S.Ct. at 2513.

*Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). The Court must therefore examine the elements essential to Paragon's counterclaims under both Section 1 and Section 2 of the Sherman Act to determine whether P & G's motion for summary judgment should be granted.

### IV.

■ Paragon's Section 1 allegations involve the written 1992 and 1993 agreements and an alleged informal expansion of that agreement to charge the private label manufacturers excessive licensing fees. In order to establish a Section 1 claim, Paragon must prove: (1) that there was concerted action involving P & G; (2) that the concerted action caused anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that plaintiff was injured as a proximate result of the concerted action. *Petruzzi's IGA Supermarkets v. Darling–Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.1993). It is on the first and third prongs that Paragon's case fails as a matter of law.

■ Paragon bears the burden at trial to show that the objects of the concerted action were illegal. The settlement of patent litigation, in itself, is not an antitrust violation. *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976). The Supreme Court has explained, "Where there are legitimately competing claims or threatened interferences, a set-

tlement by agreement, rather than litigation, is not precluded by the Act." *Standard Oil Co. (Indiana) v. United States*, 283 U.S. 163, 171, 51 S.Ct. 421, 75 L.Ed. 926 (1931). Yet, "[a]ny agreement between competitors may be illegal if part of a larger plan to control interstate markets." *Standard Oil*, 283 U.S. at 169, 51 S.Ct. 421 (citing cases).

■ The issue is whether the agreements between K–C and P & G were part of a larger plan to control interstate markets. The central inquiry must be into the intent of P & G. The Fourth Circuit explained that in analyzing a settlement agreement to determine if it violates the antitrust laws, the "critical factor" is "the anticompetitive intent or purpose of the parties." *Duplan Corp.*, 540 F.2d at 1221. To be illegal under the antitrust laws, settlement agreements must "be entered into in bad faith and utilized as part of a scheme to restrain or monopolize trade." *Id.* at 1220. As stated by the Supreme Court, "the lawful individual monopolies granted by the patent statutes cannot be unitedly exercised to restrain competition." *Standard Oil*, 283 U.S. at 174, 51 S.Ct. 421.

In the present case, there is no direct evidence of a purpose or intent by P & G to monopolize through execution of the agreements. The only direct evidence of any motive shows that P & G entered the agreements to settle its present and reasonably foreseeable patent disputes.

Paragon points to evidence in the record which shows that P & G was concerned about the erosion of its market share caused by the private label manufacturers. There is also evidence that at the time the 1992 agreement was signed, both K–C and P & G had an interest in protecting their market positions from incursions by the private label manufacturers. (D.I. 184, Tab 12, B 95). There is additional evidence that P & G used the enforcement of its patents on the barrier leg cuff feature to fight the loss of its market share. (D.I.

184, Tab 27, B 277). Furthermore, P & G and K–C each offered to license barrier leg cuff patents for approximately 2.5% of net sales. This parallel action is asserted to reflect the existence of concerted action to monopolize. Paragon contends that based on this evidence it is "entitled to the reasonable inference that P & G and K–C had conspired to enforce patents subject to the May 1992 agreement against their smaller rivals in the disposable diaper industry." (D.I. 186 at 25).

The most substantial of these charges is that P & G and K–C acted in concert to set the royalty rate at 2.5% of net sales. Taking the evidence in the light most favorable to Paragon, a reasonable jury could find the 2.5% rate to be onerous. The Supreme Court has held that charging high royalties, in itself, is "without legal significance." *Standard Oil*, 283 U.S. at 172, 51 S.Ct. 421. The Supreme Court has also noted, however, that the "rate of royalties may, of course, be a decisive factor in the cost of production. If combining patent owners effectively dominate an industry, the power to fix and maintain royalties is tantamount to the power to fix prices." *Standard Oil*, 283 U.S. at 174, 51 S.Ct. 421.[7]

The Supreme Court has admonished courts not to infer illegality from actions that, on their face, are not indicative of monopolization. In *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763–64, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the court held that concerted action should not be inferred from a manufacturer's termination of a distributor after the manufacturer received complaints from the distributor's competitors. Subsequently, in *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.*, 475 U.S. 574, 583, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) the court ruled that in order to survive summary judgment the party alleging an antitrust violation must present evidence to exclude the possibility that alleged conspirators acted independently. Allowing inferences of illegality to be drawn from ambiguous evidence "could deter or penalize perfectly legitimate conduct." *Monsanto*, 465 U.S. at 763, 104 S.Ct. 1464.

The settlement of disputes is legitimate conduct. Indeed, the law encourages the settlement of disputes. *Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed.Cir.1988). This is especially true for patent disputes. The Sixth Circuit has explained,

> Public policy strongly favors settlement of disputes without litigation. Settlement is of particular value in patent litigation, the nature of which is often inordinately complex and time consuming. Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit.

*Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). The settlement of patent disputes should not be used to infer an agreement to fix royalty rates or to discriminatorily enforce patents to restrain competition. Although the scope of the agreements between P & G and K–C was broad, the agreements resolved actual or reasonably foreseeable intellectual property disputes. There is no direct evidence of bad faith or an intent to restrain or monopolize trade. There is no inferential evidence that is inconsistent with P & G's contention that the agreements were designed to settle intellectual

---

**7.** Critical factual differences exist between the agreements in the present case and those in *Standard Oil*. In the agreement at issue in *Standard Oil* the parties issued licenses on each other's patents and shared in the royalties procured from those licenses. The royalty rates were explicitly agreed upon by the parties to the contract. *Standard Oil*, 283 U.S. at 168, 51 S.Ct. 421. In the present

case, K–C and P & G maintain the right to license their own patents, but not the other party's patents, and they do not share their respective royalties. Furthermore, P & G and K–C did not explicitly agree to certain royalty rates. Any agreement to fix the 2.5% rate would have to be inferred from their subsequent conduct.

property disputes rather than to monopolize.

The *Monsanto* and *Matsushita* standard does not require direct evidence of concerted illegal action, but it does require, at a minimum, circumstantial evidence that refutes the possibility that the alleged conspirators were acting on their own with properly competitive motives. *See Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1364–65 (3d Cir. 1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Paragon must produce "direct or circumstantial evidence that reasonably tends to prove the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225, 1232 (3d Cir.1988) (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464). To do this, Paragon must show that P & G acted against its economic interests and had a motive to enter into agreement. *Houser*, 845 F.2d at 1232. P & G and K–C may have had a motive to enter into an agreement against the private label manufacturers, but there is no evidence that any of P & G's activities were against its economic interests. In fact, curtailing patent litigation with K–C was very much in P & G's economic interests, as was the charging of a substantial licensing fee for the barrier leg cuff technology. The actions of P & G were as consistent with legitimate action as with illegal activity.

There is no genuine dispute of material fact regarding the intent of P & G in entering the patent agreements. All evidence shows that P & G entered into those agreements to settle patent disputes that then existed or which were likely to exist in the future. No inference of concerted activity to monopolize the disposable diaper industry can be gleaned from the settlement of these patent disputes. There-

fore, the first and third prongs of the four-part test set forth in *Petruzzi's IGA*, 998 F.2d at 1229, were not met as a matter of law.

## V.

▮ Paragon's Section 2 claim is based on P & G's alleged policy "of soliciting and obtaining United States letters patents which are excessive in number and virtually inextricable from each other and from the prior art." In order to establish a Section 2 violation, Paragon must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). It is on the third prong that Paragon's case fails as a matter of law.[8] The conduct of a single firm is unlawful only when the firm "actually monopolizes or dangerously threatens to do so." *Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884; *see also, Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir.1994) (finding market share to be the most important of several relevant factors); *Van Dyk Research Corp. v. Xerox Corp.*, 478 F.Supp. 1268 (D.N.J.1979), *aff'd*, 631 F.2d 251 (3d Cir. 1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981) (finding that 35% market share in the context of that case did not constitute monopoly power). There is no allegation that P & G has actually monopolized or has threatened to do so. Paragon argues only that P & G and K–C together wield monopoly power. As a result, there can be no valid Section 2 claim.

▮ Even if a reasonable jury could find that P & G exercises monopoly power in the relevant market, Paragon's claim would be foreclosed by the *Noerr–Pen-*

---

8. In addition, the Supreme Court has held that the mere accumulation of patents is not in and of itself illegal. *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 834,

70 S.Ct. 894, 94 L.Ed. 1312 (1950), *overruled in part on other grounds*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

**110**

*nington* doctrine. As stated by the Supreme Court, "[t]hose who petition government for redress are generally immune from antitrust liability." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56–57, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993). Paragon has not produced any evidence to show that P & G's accumulation of patents would fit within the "sham" exception to that doctrine. A patent application would be a "sham" if it were "not genuinely aimed at procuring favorable government action." *See Id.* 508 U.S. 49, 113 S.Ct. at 1927. Anticompetitive intent alone does not transform otherwise legitimate activity into a sham. *Id.* Therefore, to the extent that P & G does wield market power, its accrual of a patent "thicket" still would not constitute a Section 2 violation because it would be immune under the *Noerr–Pennington* doctrine.

### VI.

In sum, there is no genuine dispute of material fact regarding Paragon's antitrust counterclaims. They are insufficient as a matter of law. Therefore, P & G's motion for summary judgment will be granted and the counterclaims dismissed.