Norman LAW, et al., Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

William HALL, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

Doug SCHREIBER, et al., Plaintiffs,

v.

The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

Civil Action Nos. 94–2053–KHV, 94–2392–KHV and 95–2026–KHV.

United States District Court, D. Kansas.

April 20, 1998.

Lori R. Schultz, W. Dennis Cross, Morrison & Hecker L.L.P., Kansas City, MO, Robert G. Wilson, Cotkin & Collins, Los Angeles, CA, Gerald I. Roth, Allentown, PA, for Plaintiffs.

Linda J. Salfrank, John J. Kitchin, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, Craig T. Kenworthy, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Overland Park, KS, Beverley J. Klein, Howard J. Roin, Alan N. Salpeter, Michele L. Odorizzi, Bradley J. Andreozzi, Mayer, Brown & Platt, Chicago, IL, Alan I. Rothenberg, William J. Meeske, Latham & Watkins, Los Angeles, CA, William C. Barnard, Gayle A. Reindl, Sommer & Barnard, P.C., Indianapolis, IN, Gregory L. Curtner, Miller, Canfield, Paddock & Stone, P.C., Ann Arbor, MI, for Defendants.

Stephen M. Bledsoe, Bryan Cave LLP, Kansas City, MO, for Intervenor-Plaintiff.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

These class action price-fixing cases come before the Court on defendant's *Motion For Partial Summary Judgment* (Doc. # 613) in *Law, et al. v. National Collegiate Athletics Association,* Case No. 94–2053; defendant's *Motion For Partial Summary Judgment* (Doc. # 91) in *Hall, et al. v. National Collegiate Athletics Association,* Case No. 94–2392; and defendant's *Motion For Partial Summary Judgment* (Doc. # 41) in *Schreiber, et al. v. National Collegiate Athletics Association,* Case No. 94–2026. In all three cases, the National Collegiate Athletic Association [NCAA] seeks partial summary judgment with respect to groups of coaches "for whom plaintiffs do not have and will not have evidence of impact" because their final expert report contains no analysis or individualized finding of damage. It also seeks summary judgment as to (1) claims of any individual class member who failed to return a timely and accurate "Restricted Earnings Coach Information Sheet"; (2) claims of individuals who are not class members; (3) damages incurred after May 25, 1995, when the NCAA rescinded the salary cap which violated Section 1 of the Sherman Act, 15 U.S.C. § 1; (4) damages which represent a Consumer Price Index adjustment to plaintiff's base damage calculation; and (5) plaintiffs' claim for injunctive relief. At a status conference on April 2, 1998, the Court advised the parties of its intended ruling on these motions. This

memorandum will briefly articulate the basis for its ruling.

## I.  HISTORY OF THE CASE

On January 23, 1998, the Tenth Circuit affirmed this court's order which permanently enjoined the NCAA from re-enacting compensation limits such as those contained in the restricted earnings rule [the Rule] because, as a matter of law, the Rule violated Section 1 of the Sherman Act, 15 U.S.C. § 1. *Law v. National Collegiate Athletic Ass'n,* 134 F.3d 1010, 1024 (10th Cir.1998). In determining that the Rule constituted an unreasonable restraint of trade under Section 1, the Tenth Circuit inquired whether the challenged restraint had a substantially adverse effect upon competition, and whether the pro-competitive virtues of the alleged wrongful conduct justified the otherwise anticompetitive effects. 134 F.3d at 1016–17, 1019. The Court of Appeals answered the first question in the affirmative, holding that anticompetitive effect was established as a matter of law on the undisputed record. 134 F.3d at 1020. It noted that "[u]nder a quick look rule of reason analysis, anticompetitive effect is established, even without a determination of the relevant market, where the plaintiff shows that a horizontal agreement to fix prices exists, that the agreement is effective, and that the price set by such an agreement is more favorable to the defendant than otherwise would have resulted from the operation of market forces." *Id.* It reasoned that the undisputed facts in this case supported a finding of anticompetitive effect, as follows:

> The NCAA adopted the REC Rule to reduce the high cost of part-time coaches' salaries, over $60,000 annually in some cases, by limiting compensation to entry-level coaches to $16,000 per year. The NCAA does not dispute that the cost-reduction has effectively reduced restricted-earnings coaches' salaries. Because the REC Rule was successful in artificially lowering the price of coaching services, no further evidence or analysis is required to find market power to set prices.

*Id.* Having concluded that the Rule had a substantially adverse effect upon competition, the Tenth Circuit inquired whether the pro-competitive benefits of the restriction—retaining entry level jobs, reducing costs, and maintaining competitive equity—justified the anticompetitive effects. 134 F.3d at 1021–24. The Court of Appeals resolved this question in the negative, noting that the NCAA had failed to present evidence that the Rule would be effective over time in creating entry-level positions, reducing deficits, enhancing competition, leveling an uneven playing field, or reducing coaching inequities. *Id.* It also noted that cost-cutting by itself is not a valid pro-competitive justification. As a result, the Tenth Circuit concluded that the NCAA had not demonstrated a genuine issue of fact whether it had violated Section 1 of the Sherman Act.

▬▬▬  Proof that the NCAA committed an antitrust violation does not afford plaintiffs an automatic right to damages, however, under Section 4 of the Clayton Act, 15 U.S.C. § 15; such proof establishes only that injury may result and does not mean that any plaintiff has been actually injured within the meaning of Section 4. *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). In order to recover under Section 4 of the Clayton Act, plaintiffs must establish that their injuries were caused "by reason of" defendant's anticompetitive activity. 15 U.S.C. § 15. The "by reason of" language is the starting point for analyzing causation and damages, the two aspects of plaintiffs' case which are at issue here.

## II.  ISSUES TO BE RESOLVED

The parties have sharply divergent views on two issues which pervade the motions for partial summary judgment: (1) whether the fact of antitrust injury has already been established as a matter of law, so that plaintiffs are relieved of any burden of further proof on that issue, or whether the matter remains to be determined at trial; and (2) whether plaintiffs are entitled to prove the fact of antitrust injury on a class wide basis or whether they must do so on a coach-by-coach basis for more than 3,000 class members. Plaintiffs maintain that the fact of damage was conclusively resolved in the order which granted plaintiffs' motion for summary judg-

ment on August 2, 1995, and the Tenth Circuit affirmance on January 23, 1998. Defendant disagrees, contending that the Tenth Circuit said nothing about whether any particular plaintiff sustained injury and did not mention Section 4 of Clayton Act. The NCAA further notes that a finding of anticompetitive effect under Section 1 of Sherman Act does not mean that every class member sustained antitrust injury and that in fact plaintiffs' expert, Dr. Robert D. Tollison, found that many coaches (some 60% of the class members) sustained no damages whatsoever.

The Court agrees with the NCAA that the fact of antitrust injury remains an issue for trial.[1] It disagrees with the NCAA's ancillary arguments that Dr. Tollison seeks to prove antitrust injury by estimating the amount of damages which plaintiffs incurred; that aside from Dr. Tollison's statistical analysis, plaintiffs have no evidence of antitrust injury; and that fact of injury cannot be established on a class wide basis.

### A. Causation

■ Causation evidence under Section 4 must establish that the injuries which plaintiffs claim are attributable to the antitrust conspiracy, and not to other factors. *See, e.g., Van Dyk Research Corp. v. Xerox Corp.,* 631 F.2d 251, 254–56 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981) (plaintiff not entitled to recovery where injury caused by cash flow problems, inability to raise money through new stock offerings, and failure of marketing arrangement); *R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954, 964 (M.D.Pa.1981).

The purpose of the antitrust injury requirement is to ensure that the harm claimed by plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) The Supreme Court's observation in *Atlantic Richfield* underscores the salience of the fact of injury inquiry, as follows:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

495 U.S. at 344, 110 S.Ct. 1884. In this regard, the Supreme Court reaffirmed *Brunswick Corp. v. Pueblo Bowl–O–Mat. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), which held that plaintiffs seeking damages under Section 4 of the Clayton Act must prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[2] *See also, Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).[3]

■ In order to establish causation under Section 4, plaintiffs must demonstrate that the anticompetitive activity was "a mate-

---

1. This ruling disposes of *Plaintiffs' Motion In Limine To Preclude Evidence Or Argument Concerning Impact Or Fact Of Damage To The Class* (Doc. # 661) filed February 4, 1998.

2. In *Brunswick,* the Supreme Court noted that the injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" and that "[i]t should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" 429 U.S. at 489, 97 S.Ct. 690 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

3. In *Cargill,* the Supreme Court emphasized the necessity for scrutinizing the *Brunswick* antitrust injury factor and extended this requirement to

cases such where plaintiffs sought an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court held that in such a case, a private plaintiff is required to show threatened antitrust injury just as a plaintiff seeking damages under Section 4 of the Clayton Act is required to show actual antitrust injury. 479 U.S. at 113, 107 S.Ct. 484. The Court reaffirmed that an injury, although causally related to an antitrust violation, nevertheless does not qualify as "antitrust injury" unless it can be attributed to an anticompetitive aspect of the practice under scrutiny. The Court added that "a showing of loss or damage due merely to increased competition does not constitute such injury." 479 U.S. at 122, 107 S.Ct. 484.

rial cause" of their injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 & n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).[4] They need not rule out "all possible alternative sources of injury." *Id.; see also Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1075 n. 3 (9th Cir.1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971) (antitrust violation need not be "sole" or the "controlling" cause of injury). If there is sufficient evidence in the record to support an inference of causation between the antitrust violation and the injury suffered, the ultimate conclusion as to what that evidence proves is for the jury. *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). Once plaintiffs establish that defendant's anticompetitive activity was a material cause of "some" of their injury, however, the remainder of the damage inquiry is judged under the amount of damage standard. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. at 114 n. 9, 89 S.Ct. 1562.

While the evidence which links the alleged antitrust violation to plaintiffs' injuries must be more precise than the evidence establishing the amount of injury which they have suffered, see *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Van Dyk Research Corp. v. Xerox Corp., supra*, 631 F.2d at 255; *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 391–92, 394 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), plaintiffs' burden in proving fact of injury may be discharged by reasonable inferences from circumstantial evidence. *World Of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1478 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1525 (10th Cir.1984), *aff'd* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Any evidence which is logically probative of a loss attributable to the violation will advance plaintiffs' case. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977) (absolutely no

requirement that loss be personal or unique to individual plaintiff, so long as plaintiff has suffered loss in his business or property; thus, when violation impacts class of persons, no reason why proof of causation cannot be made on common basis so long as common proof adequately demonstrates some damage to each individual).

As a practical matter, in a class action context, proof of an effective conspiracy to fix prices will include facts which tend to establish—perhaps circumstantially—that each class member was injured. *Presidio Golf Club v. National Linen Supply Corp.*, 1976 WL 1359, *5 (N.D.Cal.1976). The district court in *Presidio Golf* noted that an inference of antitrust injury is justified in certain circumstances, as follows:

> [I]n the class action context the inference is predicated on the establishment of certain facts: (1) an antitrust violation, typically a conspiracy to fix prices or allocate markets; (2) an ability on the part of defendant-conspirators to effectuate the conspiracy; (3) generalized price increases or damages in the industry involved; and (4) purchase or, as here, rental by plaintiffs during the period of anti-competitive activity.

*Id.* (citations omitted). In such circumstances, unless it is clear that no plaintiff was injured, the fact that defendant may be able to defeat a showing of causation as to a few individual class members would not defeat the inference of antitrust injury; the exact amount of injury to each class member should be treated as an issue at the damage phase of the trial. *Id.* at *5–6. *See also In re Master Key Antitrust Litigation*, 528 F.2d 5, 12 n. 11 (2d Cir.1975) (if plaintiffs establish that defendants engaged in unlawful national conspiracy which had effect of stabilizing prices at noncompetitive levels and that plaintiffs were consumers of that product, jury could reasonably conclude that defendants' conduct caused injury to each plain-

---

4. As noted above, plaintiffs have already proven that the NCAA violated the antitrust laws. Under *Zenith Radio Corp. v. Hazeltine Research. Inc., supra*, 395 U.S. at 114 n. 9, 89 S.Ct. 1562, their burden of proving fact of damage under Section 4 of the Clayton Act is satisfied by proof of "some damage" flowing from the unlawful conspiracy.

tiff), citing *In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269, 275–76 (D.D.C.1972).

The Third Circuit Court of Appeals took a similar view in B*ogosian v. Gulf Oil Corp., supra,* 561 F.2d at 455, when it directed the district court to reconsider its refusal to allow proof of antitrust injury on a class wide basis, as follows:

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "(The) burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by ... proof of some damage flowing from the unlawful conspiracy...."

*Zenith Radio, supra,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9. Under these circumstances, proof on a common basis would be appropriate.

*Accord, Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979) (proof of conspiracy to establish "base" price for negotiations with individual plaintiffs, together with proof that price was higher than would prevail under competitive conditions, would be common to class and "would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs" would vary); *In re Wirebound Boxes Antitrust Litigation,* 128 F.R.D. 268, 272 (D.Minn.1989) (common proof of impact possible even where prices individually negotiated, because proof of impact typically follows from proof of price-fixing conspiracy where defendants have sufficient market power); *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 734 (N.D.Ill.1977) ("Courts have consistently held that an illegal price fixing scheme presumptively impacts upon all purchasers of a price fixed product in a conspiratorially affected market.").

## B. Damages

An antitrust plaintiff who is injured in his person or property by anticompetitive activity is entitled to recover damages. In economic terms, the amount of damages is the difference between what plaintiff could have made in a hypothetical free economic market and what plaintiff actually made in spite of defendant's anticompetitive activities.[5] *Bigelow v. RKO Radio Pic-*

---

5. Methods by which an antitrust plaintiff can establish lost profits include (1) comparing plaintiff's profits before or after the alleged anticompetitive activity with the profits made while plaintiff was subjected to the anticompetitive activity; (2) examining the profits of a business comparable to plaintiff's business which was not affected by the anticompetitive activity; and (3) projecting the market share which plaintiff would have attained absent the anticompetitive activity, and then projecting plaintiff's profits accordingly. ABA Antitrust Section, Antitrust Law Developments (3d ed.1992) at 411–13, 669–673, and cases cited therein. In this case, plaintiffs have combined the "before-and-after" and "yardstick" approaches to project the compensation they would have attained absent the NCAA's anticompetitive activity.

Methodologies of this kind have been cited with approval by numerous courts. *See, e.g., In re South Central States Bakery Products Antitrust*

*Litigation,* 86 F.R.D. 407, 422 (M.D.La.1980) (certifying class based on representations that impact of defendants' conspiracy could be shown by using at least one of four accepted methods, or a combination of these methods: comparing prices in different geographical regions, comparing prices and profits of conspirators versus nonconspirators, comparing prices in comparable markets, and comparing prices or profits before and after termination of the conspiracy); *In re Domestic Air Transportation Antitrust Litigation,* 137 F.R.D. 677, 689–90, 692 (N.D.Ga.1991) (certifying 12.5 million member class where plaintiffs presented potential statistical methodologies for proving injury); *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 251–52 (S.D.Tex.1978) (class certified based on prediction that injury could be determined to a "reasonable degree of certainty" by "either of two generally accepted methodologies"); *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 697–98 (D.Minn.1995).

*tures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (antitrust damages measured by "comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions.") See generally, II Areeda & Turner, *Antitrust Law* 231–34 (1978).

■ Once an antitrust violation has been established, however, the burden of proving damages is "to some extent lightened." *J. Truett Payne Co. v. Chrysler Motors Corp., supra,* 451 U.S. at 568, 101 S.Ct. 1923. Our willingness to accept a degree of uncertainty in fixing the amount of damages rests in part on the difficulty of ascertaining business damages, in that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Id.* at 566, 101 S.Ct. 1923. Our willingness also rests on the principle that "it does not come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *Id.*

In *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* the Supreme Court accepted the proposition that damages could be awarded under relaxed rules, on the basis of plaintiff's damage estimate. In doing so, it repeated that "in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." In *Bigelow v. RKO Radio Pictures, Inc., supra,* the Supreme Court explained that "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and that "[f]ailure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." 327 U.S. at 264–65, 66 S.Ct. 574.

■ Therefore, to establish the amount of injury, plaintiffs need not establish their damages with "mathematical precision."

*Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242, 246 (10th Cir.1976), cert. denied, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Plaintiffs need only provide such evidence that the jury is not left to "speculation or guesswork" in . determining the amount of damages to award. *Bigelow v. RKO Radio Pictures, supra,* 327 U.S. at 263–65, 66 S.Ct. 574; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. at 123–24, 89 S.Ct. 1562; *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 836 (9th Cir.1982) (study of cases in this area readily dispels any impression that question of damages is governed by application of common law. rule of reasonable certainty; cases have long since departed from this rule in antitrust litigation); *Graphic Products Distributors, Inc. v. ITEK Corp.,* 717 F.2d 1560, 1579–80 (11th Cir.1983) (once antitrust violation and its causal relation to plaintiff's injury have been established, burden of proving amount of damages is much less severe). Once the existence of injury is established by direct evidence or inference from the character of a sustained conspiracy, the proof necessary to set the amount of damages need not be exact.

## III. ANALYSIS

As noted above, in all three cases, the NCAA seeks partial summary judgment regarding (1) groups of individual coaches "for whom plaintiffs do not have and will not have evidence of impact"; (2) claims of any individual class member who failed to return a timely and accurate "Restricted Earnings Coach Information Sheet"; (3) claims of individuals who are not class members; (4) damages incurred after May 25, 1995, when the NCAA rescinded the salary cap which violated Section 1 of the Sherman Act, 15 U.S.C. § 1; (5) damages representing a Consumer Price Index adjustment to plaintiff's base damage calculation; and (6) plaintiffs' claim for injunctive relief. We address each argument in turn.

### A. Groups of individual coaches "for whom plaintiffs do not have and will not have evidence of impact"

The NCAA asserts that plaintiffs' expert methodology is "the only basis on which

plaintiffs claim they can demonstrate the essential element of fact of injury for each class member"; that Dr. Tollison's report contains no individualized finding of damages for certain coaches; and that as to such coaches, defendant is entitled to summary judgment. According to the NCAA, coaches in this category include coaches for whom Dr. Tollison's final report contains no analysis or individualized finding of damages; coaches for whom Dr. Tollison's methodology finds "negative damages"; coaches whose academic year compensation was always less than $12,000; graduate assistant coaches whose pay was determined by the amount of graduate tuition at a particular institution; and coaches who did became restricted earnings coaches after the NCAA rescinded the Rule and who received more than $12,000 academic year compensation. According to the NCAA, plaintiffs do not have and will not have evidence of impact as to such coaches.

Dr. Tollison is the Duncan Black Professor of Economics and General Director of the Center for Study of Public Choice at George Mason University in Fairfax, Virginia. He earned his Ph.D. in Economics from the University of Virginia in 1969. His background and credentials are impressive, and his qualifications as an expert are undisputed. Plaintiffs claim that he has developed a methodology which is a scientifically valid way of demonstrating that the Rule had an impact on all three classes. More specifically, plaintiffs argue that Dr. Tollison's testimony will demonstrate "in the aggregate, that the REC Rule was a material or substantial factor causing injury to class members." Consistent with Fed.R.Civ.P. Rule 26(a)(2)(B), Dr. Tollison afforded defendant a complete statement of the opinions which he intends to express and the reasons therefore, the data

and other information which he considered in forming his opinions, and other necessary information.

Because of scheduling issues peculiar to this case, Dr. Tollison's compliance with Rule 26(a)(2)(B) was evidenced not by a single written report but by a series of reports which, read together, reveal the scope of his research and intended testimony. See *Amended Preliminary Damage Report* (February 20, 1997)[6]; *Interim Damage Report* (November 21, 1997); and *Damage Report* (January 19, 1998).[7] Dr. Tollison's opinion, as revealed in these reports, has two components. First, based on economic theory and common sense, Dr. Tollison first explains that the NCAA engaged in the exercise of monopsony power; that it singled out a class of specific coaches from whom to extract salary concessions; and that in doing so the NCAA injured members of the plaintiff class by reducing to $12,000 the compensation of restricted earnings coaches who had been earning more than $12,000 and exerting downward pressure on salaries of coaches below the $12,000 cap. See *Declaration* (April 3, 1997). Dr. Tollison then uses a statistical damage model to determine: (1) whether statistical data confirm his theoretical conclusions concerning the NCAA's cartel behavior and the injuries flowing therefrom; and (2) if so, the amount of resulting damages which plaintiffs sustained. Based on that analysis, Dr. Tollison concludes that the damage model "work[s] well" and that it offers "a robust explanation of coaches' compensation, a statistically reliable estimate of the effect of coaches' age on compensation, and a sound basis for estimating what RECs would have been compensated but for the REC rule." *Damage Report* (January 19,

---

**6.** Dr. Tollison's original *Damage Report* was dated February 3, 1997. He amended it on February 5 and February 20, 1997.

**7.** The NCAA's expert, John R. Umbeck, Ph.D., likewise authored a series of reports which reveal the scope of his research and intended testimony under Rule 26(a)(2)(B). See *Expert Report* (March 14, 1997), which critiqued the methodology proposed by Dr. Tollison's report of February 20, 1997; *Affidavit of Dr. John R. Umbeck* (February 2, 1998), which critiqued the methodology proposed by Dr. Tollison's report of January

ary 19, 1998; and *Expert Report* (February 9, 1998).

On March 4, Dr. Tollison responded to Dr. Umbeck's critiques. See *Declaration of Robert D. Tollison* (April 3, 1997). The battle of the experts raged on as Dr. Umbeck countered with a critique of Dr. Tollison's critique. See *Supplemental Affidavit of Dr. John R. Umbeck* (April 16, 1997). Dr. Tollison also filed an affidavit in opposition to the instant motions for summary judgment. See *Declaration of Robert D. Tollison* (January 19, 1998).

1998), at 7. According to Dr. Tollison, the analysis reveals that restricted earnings coaches on a classwide basis sustained actual damages in the amount of $32,764,579. This figure represents the sum of all damages sustained by coaches for whom plaintiffs' methodology predicts damages. For other coaches—those for whom Dr. Tollison's methodology predicts no damages—plaintiffs make no claim for compensation.[8]

In seeking summary judgment, the NCAA argues that plaintiffs' methodology is the only evidence on which they rely to demonstrate antitrust injury. In so arguing, the NCAA misreads or ignores the broader import of Dr. Tollison's testimony—and this fact is fatal to its argument. Dr. Tollison does not seek to prove the fact of antitrust injury "only" through statistical methodology; he uses the methodology to test his theoretical opinions about the manner in which the Rule depressed salaries for restricted earnings coaches, and also to calculate damages. Dr. Tollison's methodology is by no means the "only" basis for plaintiffs' claim of antitrust injury. Plaintiffs rely upon Dr. Tollison's economic expertise concerning the operation of cartels and price restraints, among other things, and established evidence concerning the formation, duration and operation of this conspiracy in particular. To the extent that plaintiffs rely on such evidence, independent of their expert methodology, the NCAA's motion misses the mark.

■ The NCAA's motion is also doomed by a plethora of disputed facts. It is perhaps true that class members sustained no injury if they always earned less than $12,000, before, during, and after the Rule went into effect. The NCAA makes a superficially appealing if simplistic argument that they did not. But Dr. Tollison's view is that the Rule exerted a downward ripple effect on salaries below the $12,000 cap, thus depressing the salaries of all coaches who were subject to the Rule. According to Dr. Tollison:

Both economic theory and common sense suggest that plaintiff coaches were in a radically different bargaining environment after the imposition of the restrictions so that there is every reason to predict that RECs earning less than $12,000 were impacted by these restrictions. My damage methodology provides a way to assess the fact and amount of these damages.

*Declaration of Dr. Robert D. Tollison* (January 19, 1998), ¶ 8. As to class members who did became restricted earnings coaches after May 25, 1995, and who received more than $12,000 academic year compensation, the NCAA's position is similarly subject to dispute. While the NCAA's position may again have superficial appeal, Dr. Tollison's testimony is that the price-fixing conspiracy continued to depress salaries even after the NCAA's enforcement mechanism (the challenged bylaw) was rescinded. His opinion is as follows:

> [T]he defendant ... continues to argue that there were no damages to coaches after the National Collegiate Athletic Association ("NCAA") moved to "rescind" the REC compensation limitations on May 25, 1995. As I have discussed in my reports and prior declaration in more detail, I strongly disagree with this analysis. Cartels, especially cartels against labor, do not easily or quickly dissolve. Moreover, the NCAA's actions during this period do not suggest the dissolution of the REC cartel. These points are discussed in detail in my Amended Preliminary Damage Report cited above. For this reason, I think it is appropriate to calculate damages through 1996–97. My damage methodology will assign damages in this period if a coach's predicted pay exceeds his or her actual pay. Hence, it is entirely possible that coaches in the analogous REC position who were hired after May 25, 1995, and who were paid more than $12,000 were injured by the REC compensation limitations.

---

**8.** Although the NCAA's seeks summary judgment regarding coaches for whom Dr. Tollison has prepared no analysis or individualized finding of damages, the ready answer is that plaintiffs do not seek damages for such coaches. The same is

true for coaches for whom Dr. Tollison finds "negative damages." As to both categories, the NCAA's motion for partial summary judgment is moot.

*Declaration of Dr. Robert D. Tollison* (January 19, 1998), ¶ 9. These issues are not ones which can be resolved as a matter of law on this record.[9] As to such coaches, plaintiffs will indeed have evidence of impact, and the NCAA's motion for summary judgment on these issues must be overruled.

In *Hall* and *Schreiber,* the NCAA also seeks summary judgment concerning all class members who held positions that were created after August 1, 1992. This argument springs from Dr. Tollison's *Amended Preliminary Damage Report* of February 20, 1997. This aspect of defendant's motion is rendered moot by Dr. Tollison's final *Damage Report* dated January 19, 1998, and it is therefore overruled.

### B. Claims of any individual class member who failed to return a "Restricted Earnings Coach Information Sheet"

In its order approving the form of notice to the class on June 11, 1997, the Court informed each class member that "[i]f you remain a member of the Class and wish to have your claim for monetary damages considered, you must complete the enclosed Restricted Earnings Coach Information Sheet" [RECIS] no later than August 1, 1997. The NCAA argues that class members who failed to heed this directive by submitting timely and complete RECIS forms should be barred from relief: first, for disobeying the court's order, and second, because plaintiffs have no independent evidence of antitrust injury and damages for such individuals.

▮ The NCAA's first argument is without merit. In circumstances such as these, the claims of absent class members in opt-out class actions cannot properly be dismissed

for failure to return a questionnaire. To require them to complete and return a questionnaire, on the condition that failure to do so would result in dismissal from the lawsuit, would have the prohibited effect of requiring them to opt into the class and violate the opt-out policy of Rule 23, Fed.R.Civ.P. *E.g., Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1556–57 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *Kline v. First Western Gov't Securities, Inc.,* 1996 WL 122717, *2 (E.D.Pa.1996); *McCarthy v. Paine Webber Group,* 164 F.R.D. 309, 313 (D.Conn.1995); *Abulaban v. R.W. Pressprich & Co.,* 51 F.R.D. 496, 497 (S.D.N.Y.1971).

The NCAA's second argument is equally non-persuasive. Dr. Tollison provides independent evidence of antitrust injury and damages for such individuals by extrapolating damages from the vast universe of data from other sources, including the class members, NCAA member institutions and the NCAA itself. The NCAA disagrees with the extrapolations. But the points of disagreement merely identify factual issues which are for the jury—not the Court—to resolve.

### C. Claims of individuals who are not class members

The NCAA claims that certain individuals who returned RECIS forms are outside any relevant class, and that it is entitled to summary judgment concerning their claims. Plaintiffs agree that the Court may properly enter summary judgment on the question of class membership, and the Court concurs.[11]

▮ In *Law,* the NCAA seeks summary judgment on the claims of Doug Leichner. Leichner claims that he was a restricted

---

9. Likewise, the NCAA's argument with respect to coaches whose pay was determined by graduate tuition must fail. While the NCAA's argument on this issue is not clear, it apparently insists that for graduate assistant coaches, their compensation was determined not by the Rule, but by the amount of graduate tuition at their respective institutions. This is the proverbial distinction without a difference. The Rule set alternative caps for the academic year: $12,000 or the cost of graduate tuition at the institution in question. The graduate tuition cap did not exist independently of the Rule; it merely placed the salary cap at a different level. The NCAA's argument

that "there is no causal connection between the REC Rule and compensation to graduate assistant coaches" cannot be intelligently followed.

11. By separate order, to which all parties have agreed, the Court determined that except for Doug Leichner, Greg Paradine and Brian Madeira, all individuals who were the subject of the NCAA's argument on summary judgment fall outside any relevant class. See *Order Granting Partial Summary Judgment* (Doc. # 813) entered April 16, 1998.

earnings coach in mens' basketball at Central Connecticut State University. The University initially agreed, but later retracted its statement, insisting that "Doug Leichner was listed as a restricted earnings coach through error." In *Hall,* the NCAA seeks summary judgment on the claims of Brian Madeira— whose circumstances are similar to those of Leichner, except that Madeira worked in the women's basketball program at Syracuse University. Like Central Connecticut State University, Syracuse initially vouched that Madeira was a restricted earnings coach but later claimed that he was so listed "due to administrative error." The jury is entitled to judge for itself whether the universities got it right the first time or the second time. Both plaintiffs are entitled to the benefit of all favorable inferences, and defendant's motion for summary judgment on their claims must be overruled.

The NCAA also argues that it is entitled to summary judgment on the claims of Greg Paradine. Paradine was a restricted earnings coach at Ohio State University in 1993–94 and 1994–95, and the parties agree that he is a proper class member to that extent. Paradine later served as a coach at the University of North Carolina and—although he was not a *restricted earnings* coach at that school—he submitted a RECIS form for that school. Plaintiffs do not dispute the fact that Paradine was not a restricted earnings coach at UNC and the NCAA's motion for partial summary judgment on the issue of class membership should be sustained.

▆ In *Schreiber,* the NCAA also seeks summary judgment on the claims of John Leudtke, a restricted earnings baseball coach at the University of Arkansas who received a special bonus of $10,356 from the Razorback Foundation—just before the Rule went into effect. It also seeks summary judgment as to Robin Dreizler, a restricted earnings baseball coach at the University of California–Los Angeles who—for three years after the Rule went into effect—received $10,000 to $15,000 in annual compensation from Easton Sports Corporation. Defendant claims that Dreizler performed no services for Easton and that Dreizler—like Leudtke—suffered no financial loss on account of the Rule. As to

Leudtke, the record reveals a genuine issue of material fact whether the Razorback payment was disguised compensation for coaching services or whether it was what it was purported to be—a "career achievement bonus" for "extraordinary services" during his career as an assistant coach. As to Dreizler, the record reveals a genuine issue of material fact whether his agreement to perform services was a sham—a conduit for disguised compensation for coaching services. Because both plaintiffs are entitled to the benefit of all favorable inferences, defendant's motion for summary judgment on their claims must be overruled.

**D. Damages incurred after May 25, 1995, when the NCAA rescinded the salary cap which violated Section 1 of the Sherman Act, 15 U.S.C. § 1**

The NCAA claims that it is entitled to summary judgment on all claims for damages which occurred after May 25, 1995, when the NCAA rescinded the Rule, because "[t]he law is clear that an alleged co-conspirator (in this case, the NCAA) cannot be liable for damages occurring after it withdraws from a conspiracy." The NCAA reasons that any damage which occurred after May 25, 1995 was caused solely by the "unilateral decisions" of NCAA member institutions for which it cannot properly be held accountable. Plaintiffs respond that the NCAA's half-hearted announcement that it had rescinded the Rule was "a far cry from a cessation of the NCAA's anti-competitive conduct," and that it was legally insufficient to immunize the NCAA from liability for the full extent of its unlawful activity.

▆ Plaintiffs correctly identify genuine issues of material fact which preclude summary judgment on this issue: whether the NCAA's action on May 25, 1995, constituted an effective "withdrawal" from the conspiracy and whether the NCAA's withdrawal (if it occurred) brought the price-fixing conspiracy to an end. Plaintiffs are entitled to the benefit of all favorable inferences on this subject, and on this record a jury might reasonably conclude that the effects of the Rule survived the Rule itself—either because the NCAA and its members informally conspired after May 25, 1995 to maintain restricted earning coach salaries at noncompet-

itive levels, or because budget constraints, contractual commitments and other factors prevented salaries from promptly rebounding to competitive levels on May 26, 1995.

■ In addition, as to the law, the NCAA has it wrong. A conspirator is liable for damages which flow from its conspiracy, and such liability does not automatically cease when the conspirator ceases its anti-competitive conduct. A conspirator is liable for the damages caused by its unlawful conduct, even if they are sustained after the unlawful conduct ceases. See *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 616 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S. Ct. 1178, 140 L.Ed.2d 186 (1998) (where conspirator withdraws from conspiracy by announcing withdrawal or reporting conspiracy to authorities, liability for *continuing illegal acts of other conspirators* ceases); *United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985) (once conspirator withdraws from conspiracy, his liability ceases as to *acts committed after his withdrawal by other conspirators* ); *Pope v. Bond,* 641 F.Supp. 489, 496 (D.D.C.1986) (under conspiracy law, co-conspirator may avoid liability for *subsequent conspiratorial acts* by withdrawing from conspiracy). Accordingly the NCAA is not entitled to summary judgment on this theory.[12]

**E. Damages which represent a Consumer Price Index adjustment to plaintiff's base damage calculation**

Citing *Locklin v. Day–Glo Color Corp.,* 429 F.2d 873, 876 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 582, 584, 27 L.Ed.2d 632 (1971), the NCAA argues that Dr. Tollison cannot use the Consumer Price Index to adjust plaintiffs' damage figures to 1997 dollars, because "the automatic trebling of damages under § 4 of the Clayton Act more than compensates antitrust plaintiffs for the time value of [their] money." See also, *State of Colorado v. Goodell Brothers, Inc.,* 1987 WL 6771, \*4 (D.Col.1987) (holding without discussion, based on *Locklin,* that adjustment for inflation should not be allowed in antitrust action because damages trebled).

■ Citing *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 996 (5th Cir. 1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), and *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1549 (8th Cir.1989), plaintiffs disagree. Plaintiffs contend that they are entitled to adjust their damage calculations to create a net present value for damages which they sustained in the past. In the Court's view, plaintiffs would have the better end of this argument[13]—were it not for 15 U.S.C. § 15(a), which none of the parties addressed in their summary judgment briefs. Section 15 provides in pertinent part as follows:

§ 15. Suits by persons injured

(a) Amount of recovery; prejudgment interest

... The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, en-

---

**12.** This holding disposes of the *NCAA Motion In Limine Objecting To Evidence Of Damages Incurred After May 25, 1995* (Doc. # 655) filed February 4, 1998.

**13.** The Court is in substantial agreement with the criticisms of *Locklin* that are articulated by Judge Easterbrook, dissenting in *Fishman v. Estate of Wirtz,* 807 F.2d 520, 582–84 (7th Cir.1986).

gaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

Dr. Tollison has estimated damages by taking the predicted pay of each restricted earnings coach, and deducting his or her actual pay (adjusted to the age of the coach and further adjusted for inflation) Nominal damages are adjusted to 1997 dollars using the October 1997 Consumer Price Index (CPI).

On the summary judgment record, the Court cannot discern whether Dr. Tollison's CPI adjustment is different from an award of interest and if so, in what respect and to what extent. If the CPI adjustment is the economic equivalent of interest, plaintiffs' right to prejudgment interest would appear to be governed by 15 U.S.C. § 15(a)—rather than the rationale articulated in *Locklin* or *State of Colorado.* Because the nature of Dr. Tollison's CPI adjustment remains unclear and because plaintiffs as non-moving parties are entitled to the benefit of all reasonable inferences in their favor, the NCAA's motion for summary judgment on this score must be denied.[14]

### F. Plaintiffs' claim for injunctive relief

The NCAA argues that it is entitled to summary judgment on the question of injunctive relief because plaintiffs have "not one shred of evidence" that they or any class members are presently threatened with loss or damage from any action that the NCAA has taken or might take against them or that they or any class members are "threatened in a real and immediate sense with any injury by the NCAA's actions." Plaintiffs disagree, citing *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 697, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) for the proposition that the Court is not limited to enjoining future threats, but is "empow-

ered to fashion appropriate restraints on the [ ] future activities both to avoid a recurrence of the violation and to eliminate its consequences."

On this record, while the prospect of a further antitrust violation does not appear to be real and immediate, it also cannot be said with clear conviction that the NCAA has abandoned its unlawful activity. Protestations of repentance and reform are conspicuously absent and plaintiffs may well receive an inadequate remedy if injunctive relief is not afforded. The relevant facts remain in dispute, however, and any determination on the summary judgment record would be premature. The parties have agreed that all issues which relate solely to injunctive relief may be reserved for trial to the Court at a later date, that resolution of this issue shall await that stage of the proceeding. See *Order To Show Cause* (Doc. # 707) filed March 13, 1998; *Defendant's Response To The Court's Order To Show Cause Regarding A Separate Trial Of Plaintiffs' Motion For A Permanent Injunction* (Doc. # 743) filed March 23, 1998.

**IT IS THEREFORE ORDERED** that except to the extent otherwise ordered in the Court's *Order Granting Partial Summary Judgment* (Doc. # 816) entered April 16, 1998, and except with respect to Greg Paradine in *Hall, et al. v. National Collegiate Athletic Association,* Case No. 94–2392, defendant's *Motion For Partial Summary Judgment* (Doc. # 613) in *Law, et al. v. National Collegiate Athletics Association,* Case No. 94–2053, be and hereby is overruled; defendant's *Motion For Partial Summary Judgment* (Doc. # 91) in *Hall, et al. v. National Collegiate Athletics Association,* Case No. 94–2392, be and hereby is overruled; and defendant's *Motion For Partial Summary Judgment* (Doc. # 41) in *Schreiber, et al. v. National Collegiate Athletics*

---

14. In itself, this ruling does not dispose of the *NCAA Motion In Limine Objecting To Evidence of Consumer Price Index Adjustment* (Doc. # 655) filed February 4, 1998. On April 14, 1998, however, the Court conducted a brief evidentiary hearing outside the presence of the jury. At that time Dr. Tollison explained his calculations with respect to the CPI and how his CPI adjustment differs from interest. At the hearing, the parties agreed that plaintiffs' right to a CPI adjustment is an issue which is properly bifurcated and tried

to the Court at an appropriate time after the jury trial on the issues of damages. Consequently, the Court will later determine whether the CPI adjustment is the functional equivalent of prejudgment interest and is thus governed by 15 U.S.C. § 15(a). See *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 986 n. 20 (5th Cir.1977). The NCAA's motion in limine is rendered moot by the parties' agreement to proceed in this manner.

*Association,* Case No. 95–2026, be and hereby is overruled.

**IT IS HEREBY FURTHER ORDERED** that defendant's *Motion For Partial Summary Judgment* (Doc. # 91) in *Hall, et al. v. National Collegiate Athletics Association,* Case No. 94–2392, be and hereby is sustained to the limited extent that the Court finds as a matter of law that Greg Paradine is not a member of the plaintiff class for periods when he served as a coach at the University of North Carolina in 1995–96 and 1996–97.

**IT IS HEREBY FURTHER ORDERED** that *Plaintiffs' Motion In Limine To Preclude Evidence Or Argument Concerning Impact Or Part Of Damage To The Class* (Doc. # 661) filed February 4, 1998, be and hereby is overruled.

**IT IS HEREBY FURTHER ORDERED** that the *NCAA Motion To Limine Objecting To Evidence Of Damages Incurred After May 25, 1995* (Doc. # 655) filed February 4, 1998, be and hereby is overruled.

**IT IS HEREBY FURTHER ORDERED** that the *NCAA Motion In Limine Objecting To Evidence of Consumer Price Index Adjustment* (Doc. # 655), be and hereby is overruled as moot.